**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **TIMOTHY EKSTROM**<br>5651 Harbor Valley Drive<br>Brooklyn, MD 21225<br><br>and<br><br>**DAVIDA CARNAHAN**<br>1131 Sailfish Court<br>Churchton, MD 20733<br><br>*Plaintiffs*,<br><br>v.<br><br>**CONGRESSIONAL BANK**, *successor by merger to* **AMERICAN BANK**<br>6701 Democracy Boulevard<br>Bethesda, MD 20817<br><u>Serve on</u>: John R. Lane, Resident Agent<br>6701 Democracy Boulevard, Suite 400<br>Bethesda, MD 20817<br><br>*Defendant*. | Civil Action No.:<br>_____ |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Timothy Ekstrom and Davida Carnahan, on behalf of themselves and the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith and Melissa L. English of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney and Veronica B. Nannis of Joseph, Greenwald and Laake, P.A., file this Complaint, sue the Defendant for cause, claim damages, and state as follows:

## <u>INTRODUCTION</u>

1.     Plaintiffs Timothy Ekstrom ("Plaintiff Ekstrom") and Davida Carnahan ("Plaintiff Carnahan") and alleged Class Members are borrowers who currently have or had a

residential mortgage loan originated or brokered by American Bank, predecessor to Defendant Congressional Bank, which was or is secured by residential real property.

2. Plaintiff Ekstrom, Plaintiff Carnahan, and alleged Class Members are victims of an illegal kickback scheme between American Bank and All Star Title, Inc. ("All Star"), a Maryland based title and settlement services company.

3. Under the scheme, American Bank, by and through its branch managers, loan officers, agents and/or other employees received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.* American Bank and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4. As an essential component of the scheme, All Star conspired to and agreed with American Bank to fix the prices charged American Bank borrowers for title and settlement services associated with the residential mortgage loans generated by All Star's illegal kickback payments to American Bank. The prices charged American Bank borrowers included amounts that were not associated with any legitimate title and settlement service and borrowers were charged the amounts solely to pay for All Star and American Bank's illegal enterprise and kickbacks.

5. American Bank benefitted from these fixed and fraudulent charges for title and settlement services because these charges ensured the continued funding of illegal kickback payments and were financed into borrowers' loans and American Bank, and its successor in interest, Congressional Bank, charges and earns interest from these charges.

6.      American Bank and All Star continuously and regularly used the interstate U.S. Mail and wires in furtherance of the Kickback Agreements, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of at three years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961, *et. seq.*

7.      American Bank and All Star fraudulently concealed the kickbacks, resulting overcharges, and wider All Star Scheme from Plaintiffs and alleged Class Members by:  laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with American Bank loans, and false and fraudulent representations and omissions in American Bank borrowers' loan documents.  These concealments prevented borrowers, regulators and auditors from discovering the kickbacks, overcharges and illegal enterprise, as wells as injuries to American Bank borrowers therefrom thereby allowing the kickbacks and overcharges to continue.

## PARTIES

8.      Plaintiffs bring this action pursuant to Fed. R. of Civ. P. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.      Plaintiff Timothy Ekstrom is a resident of Anne Arundel County, Maryland.

10.      Plaintiff Davida Carnahan is a resident of Anne Arundel County, Maryland.

11.      Defendant Congressional Bank is a Maryland-chartered commercial bank with its headquarters and principal place of business at 6701 Democracy Boulevard, Suite 400, Bethesda, in Montgomery County, Maryland.

a.  Congressional Bank is the successor in interest to American Bank, a federally chartered stock savings bank, by and through a merger completed and effective January 1, 2016, in which American Bank merged with and into Congressional Bank, with Congressional Bank surviving as the successor corporation.

b.  Congressional Bank is liable for the debts and obligations of American Bank, which includes liabilities from the claims pled herein, pursuant to § 3-713 of the Financial Institutions Article of the Maryland Annotated Code, and, on information and belief, the terms of the Agreement of Merger.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 18 U.S.C. § 1964(c).

13. Personal jurisdiction over Defendant Congressional Bank is appropriate because it is a commercial bank chartered under the laws of Maryland and transacts business in this District and Maryland, specifically engaging in residential mortgage lending related to properties located in the District, as well as other banking and lending transactions.

14. Personal jurisdiction over Defendant Congressional Bank is also appropriate because during the time period alleged herein American Bank continuously transacted business within this District, which conduct caused injury to persons residing in or located in this District. Such jurisdiction extends to Defendant Congressional Bank as American Bank's successor in interest, *Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454 (4th Cir. 1990).

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) and 18 U.S.C. § 1965.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

**I.     The All Star Scheme**

16.    At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than 30 states and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages.

**A.     All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star.**

17.    Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lenders") in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

18.    As an integral part of the All Star Scheme, All Star and the Participating Lenders agree to launder the kickbacks through a third party marketing company.

19.    All Star does not regularly use marketing companies for marketing services, nor does All Star directly solicit borrowers. In contrast, Participating Lenders and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads providers) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages from the Participating Lender.

20.     Under the Kickback Agreement, the Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender is using for its marketing services.  All Star then makes the kickback payment to the third party marketing company, and the Participating Lender receives and accepts the kickback payment when the third party marketing company applies All Star's payment for the benefit of the Participating Lender and for the services that the Participating Lender is receiving.

21.     All Star's payment laundered through the third party marketing company is an express payment for the benefit of the Participating Lender for the assignment and referral of loans under the Kickback Agreement and not a payment to the third party marketing company for legitimate marketing services; in fact, All Star receives no marketing services from the third party marketing company.

22.     To fund the kickbacks, and to ensure the kickbacks will continue, All Star and the Participating Lender agree to overcharge borrowers for title and settlement services associated with the loans that assigned and referred to All Star under the Kickback Agreement.  Specifically, All Star and the Participating Lender agree to charge borrowers amounts not associated with any legitimate title or settlement services and charged solely for the purpose of paying for the illegal kickbacks and other aspects of the illegal referring agreement ("Kickback Overcharge").

23.     All Star and Participating Lenders regularly use the interstate wires and mails in furtherance of the All Star Scheme.

24.     All Star and Participating Lenders regularly choose to transmit, receive and accept the illegal kickbacks over interstate wires.

6

25.     Participating Lenders and All Star also regularly use the interstate mails and wires to lure borrowers into the All Star Scheme and to defraud borrowers into paying the Kickback Overcharges, and other overcharges.

26.     Participating Lenders cause to be printed direct mail pieces such as postcards, letters, "SNAP Packs"  (mailers with perforated edges the recipient rips or "snaps" open), and other printed material that encourage borrowers to contact the Participating Lenders and apply for a residential mortgage loan, refinance or reverse mortgage.

27.     The Participating Lenders and All Star choose to include false representations on the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false representations is to: (i) prevent a borrower from fighting a referral to All Star, (ii) conceal the Kickback Overcharges  resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

28.     Participating Lenders and All Star cause these fraudulent solicitations to be sent through the interstate U.S. mails, in violation of 18 U.S.C. § 1341.

29.     Participating Lenders also solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers in violation of 18 U.S.C. § 1343.

30.     These borrower solicitation techniques, coupled with the Participating Lender's assignment and referral of loans to All Star under the Kickback Agreement,  lured thousands of borrowers into the All Star Scheme.

**B.** **All Star and Participating Lenders Use A Web of Concealments to Hide the Kickbacks, Overcharges, and All Star Scheme from Borrowers, Regulators and Auditors.**

31.     Intentional concealment from borrowers, regulators and auditors is essential to the success and continuation of the All Star Scheme and the illegal kickbacks.   All Star and Participating Lenders use a variety of tactics to conceal the kickbacks, Kickback Overcharges, and the All Star and the Participating Lenders' coordinated relationship under the All Star Scheme.

32.     Laundering the kickbacks through third party marketing companies is an integral part of the All Star Scheme and allows All Star and the Participating Lender to conceal the fact and amount of kickbacks from borrowers, regulators and law enforcement. All Star and Participating Lenders launder the kickbacks through third party marketing companies to also conceal the fact that anything of value was exchanged between All Star and the Participating Lender.

33.     All Star and Participating Lenders launder the kickbacks through the third party marketing companies to also conceal that the payments are kickbacks and to create the false impression that All Star is making payments for legitimate marketing services. In fact, All Star does not receive any legitimate marketing services from the third party marketing companies laundering the kickbacks. To be clear, All Star's payments laundered by the third party marketing companies were always and solely for the benefit of the Participating Lender and in exchange for the Participating Lender's assignment and referral of loans under the Kickback Agreement,  and  not for the third party marketing company's provision of any legitimate goods or services to All Star.

34.     To even further conceal the kickbacks and the All Star Scheme, All Star and the Participating Lender cause the third party marketing company to create sham invoices to create the false impression that All Star is paying for, and receiving, legitimate marketing services from the third party marketing company.  In fact, All Star does not receive any legitimate marketing services from the marketing company and All Star's payment is applied solely for the benefit of the Participating Lender.

35.     To further conceal the Kickback Overcharge from borrowers, All Star and the Participating Lender make false and fraudulent representations and omissions in borrowers loan documents, including the Truth In Lending Act ("TILA") Disclosure, the Good Faith Estimate and the HUD-1 Settlement Statement.

36.     In addition, All Star and the Participating Lender agree to and do not identify the amounts associated with the illegal kickback or Kickback Overcharge on any loan documents, including government mandated disclosure forms such as the "Good Faith" Estimate and HUD-1 Settlement Statement.

   **C.     All Star and  Participating Lenders Erect An Elaborate Co-Marketing Sham but All Star Receives no Marketing Benefit and Makes Clear that the Payments are Solely for the Assignment and Referral of Loans.**

37.     To add another layer of concealment, All Star and Participating Lenders construct an elaborate sham to create the false impression that All Star and the Participating Lender are "co-marketing."

38.     In furtherance of this sham, All Star and Participating Lenders agree to nominally include All Star on direct mail solicitations, such as direct mailers sent to borrowers. These solicitations are a sham, and fraudulent, because the Participating Lenders require, and All

Star agrees, to purposefully design the mailers to prevent borrowers from contacting All Star and to ensure the borrower will only contact the Participating Lender.

39. For example, All Star and Participating Lenders intentionally design the mailers so that borrowers would contact only the Participating Lender. The Participating Lender choose to omit any phone number, website, or contact information for All Star, and only provide a phone number for the Participating Lender so there would be no chance that a borrower would contact All Star instead of the Participating Lender.

40. The prototype for the "co-marketing" sham was developed by a postcard company contracted by All Star. The postcard company advised:

> We played around with the design a bit and what we're running into is that if we use 25-50% of the card with All Star Title's info, it makes it confusing for the person receiving the card as they can't tell who the advertisement is from. We came up with a mockup with a smaller All Star Title logo so that it doesn't totally distract from the mortgage company's information. We also removed your phone number because we don't want people to call you instead of the mortgage company.

*See* September 28, 2009 emails related to design of mailers attached as **Exhibit 1.** In 2010, All Star notified the postcard company, "We actually started a similar program with other direct mail companies and its going really really well." **Ex. 1.**

41. By design, All Star receives no actual marketing benefit from the solicitation and the entire marketing benefit flows to the Participating Lender. In exchange, under the Kickback Agreement, the Participating Lender agrees and is required to exclusively assign and refer all loans generated by the mailer to All Star for title and settlement services. Despite the sham of including All Star in the mailer, the benefit All Star in fact receives is the referral from the Participating Lender.

42.     In addition, as advised by All Star's early prototype, All Star and Participating Lenders agree to limit All Star to a negligible presence on the solicitation, with All Star occupying less than 1/5 or less of the surface area of a solicitation.   The payment made by All Star to the Participating Lender is far greater, and not reasonably related, to All Star's nominal presence in the solicitations. The inclusion of All Star on any material at all is solely for the purpose of attempting to conceal the kickbacks.

43.     The sham solicitations live up to the intended purpose.   Despite making millions in payments to Participating Lenders, All Star does not receive any marketing benefit from the sham solicitations and not a single, direct call from a borrower.   All of All Star's business continues to flow from loans assigned and referred from Participating Lenders and subject to the payment of kickbacks.

44.     The Consumer Financial Protection Board (CFPB), the federal agency responsible for RESPA enforcement, has identified that during the time period applicable to the All Star Scheme, sham "co-marketing" was so prevalent as to cause the Consumer Financial Protection Bureau ("CFPB") to issue a compliance bulletin concluding that "[b]ased on the Bureau's investigative efforts, it appears that many [marketing service agreements] are designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees." Consumer Fin. Prot. Bureau Compliance Bulletin 2015-05, https://files.consumerfinance.gov/f/201510_cfpb_compliance-bulletin-2015-05-respa-compliance-and-marketing-services-agreements.pdf.

45.     In describing the type of agreements that were used as sham fronts for illegal kickbacks, the CFPB detailed a scheme indistinguishable from the one designed by All Star and Participating Lenders in the All Star Scheme:

> [I[]n another matter that resulted in an enforcement action, **a title company entered into unwritten agreements with individual loan officers in which it paid for the referrals by defraying the loan officers' marketing expenses.** The title company supplied loan officers with valuable lead information and marketing materials. In exchange, the loan officers sent referrals to the title company. The lenders did not detect these RESPA violations and/or correct or prevent them, even when they had reason to know that the title company was defraying the marketing expenses of the lenders and their loan officers.

*Id.* (emphasis added).

46. While building the sham of "co-marketing," All Star makes clear to the Participating Lender that the payment to the Participating Lender is solely for the assignment and referral of loans for title and settlement services and attaches a production goal – referred to as a "unit goal" - to each kickback paid to a Participating Lender. As Jason Horwitz, the President and owner of All Star and the architect of the All Star Scheme described it:

> …the "unit goal" can be met with closings from the mail, or any other source. It doesn't matter where its from, as long as we hit that unit number. Basically the agreement would be that we do not contribute to another campaign until we hit that unit goal.

*See* June 22, 2011 email attached as **Exhibit 2.**

47. All Star and the Participating Lender perform the "unit goal" requirements of the Kickback Agreement with All Star paying kickbacks only after requiring a Participating Lender to document the number and value of the loans assigned and referred to All Star under the Kickback Agreement since the last kickback payment, and, on more than one occasion, leaving Horwitz to lay down the law:

> **"Ok. Just so we're clear, I'm not dropping $1 more until we close 25 NEW loans."**

*See* February 6, 2013 email attached as **Exhibit 3** (capitalization in original and bold type added). Similarly, Horwitz makes clear the marketing is for the Participating Lender – "for them", not All Star – and what All Star is paying for is the assignment and referral of loans from the Participating Lender:

| From: | Jason |
| --- | --- |
| Sent: | Monday, October 11, 2010 2:48 PM EDT |
| To: | FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=Rob |
| Subject: | RE: Marketing |
| Attachments: | image001.jpg, image002.jpg, image003.jpg |

i dont give a fuck if the mailer bombed - just a heads up, I'm doing 4 drops for him, thats it, and getting the 12 deals.  If they bitch about it or dont hold up to their end, i might be done doing marketing for them altogether

**From:** Rob Selznick
**Sent:** Monday, October 11, 2010 2:46 PM
**To:** Jason
**Subject:** FW: Marketing

**Exhibit 4,** Oct. 11, 2010 Email between All Star Owner J. Horwitz and All Star Marketing Manager R. Selznick.

## II.     By 2009, American Bank and All Star form an Association in Fact Enterprise and American Bank Begins Participating in the All Star Scheme.

48.     By at least 2009, American Bank, by and through its branch managers, loan officers and other employees, agrees to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of American Bank loans to All Star for title and settlement services.

49.     At all relevant times, the American Bank branch managers and loan officers participating in the All Star Scheme are licensed mortgage brokers and/or authorized loan officers, and at all relevant times were acting within the scope of the business relationship and their

employment on behalf of American Bank, specifically seeking borrowers and originating and securing loans for residential mortgages through American Bank and/or brokering such loans through American Bank to other lenders with whom American Bank authorized, referring American Bank borrowers to title companies, and working with title companies to close these loans.  All activities, including any interaction with All Star, were for the benefit of American Bank.

50.     By at least 2009, American Bank, by and through its branch managers, loan officers and other employees, agree to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of American Bank loans to All Star for title and settlement services.

> **A.     American Bank performs the Kickback and Cartel Agreements by and through the American Bank Nottingham Branch.**

51.     By January 2009, American Bank operates a branch at 8727 Belair Road, Nottingham, Maryland 21236 (the "American Bank Nottingham Branch").

52.     During the relevant time period, American Bank employs Brian Batterden, Raymond Notaro, Megan Foley, Amy Smith, Scott Smith, Chris Moylan, Kristin Jourdoun, Marshall Thompson, Brian Caldwell, Jason Mandel, Jay Collins, Ashley Roberts, Phil Moscirella, Michael Aldi, Elyse Levy, Michael Mattura, Michael Tragesor, Karen Crane, Adam Charney, Curt Bauer, Eric Barnes, Courtney Judge, Missy Brown, Jenny Love, Lee Scriver, Rachel  Bridges, and James Ventura as loan officers in the American Bank Nottingham Branch.  Plaintiffs believe, and therefore allege, that Brian Batterden was employed by American Bank as the branch manager of the American Bank Nottingham Branch.

53.     From 2009 through 2011, All Star pays, and American Bank receives and accepts, kickbacks for the assignment and referral of American Bank loans from the American Bank

Nottingham Branch.  These kickbacks are laundered by and through various third party marketing companies, including:

a.  $1817.95 kickback on April 21, 2009, laundered by and through Red Clay Media, Inc. ("Red Clay") a Bayonne, New Jersey based marketing company;

b.  $1,530  kickback on May 1, 2009, laundered by and through Jemco Graphic Services, Inc., a Maryland, based marketing company ("Jemco");

c.  $4,413.55 kickback on May 25, 2009, laundered by and through Jemco;

d.  $4,492.80 kickback on June 5,  2009, laundered by and through Jemco;

e.  $4,992 kickback on June 15, 2009, laundered by and through Jemco;

f.  $1,895.82 kickback on June 30, 2009, laundered by and through Red Clay;

g.  $3,100 kickback on September 4, 2009, laundered by and through Jemco;

h.  $3,100.62 kickback on October 16, 2009 laundered by and through Jemco;

i.  $3,110.62 kickback on October 23, 2009, laundered by and through Jemco;

j.  $3,125 kickback on October 30, 2009, laundered by and through Jemco;

k.  $3,140 kickback on November 6, 2009, laundered by and through Jemco;

l.  $1,999.80  kickback laundered by and through Influence Direct, a Tenessee based leads ad marketing company;

m.  $2,059.80 kickback on December 2, 2009, laundered by and through Influence Direct;

n.  $3,100 kickback on January 12, 2010, laundered by and through Jemco;

o.  $3,105 kickback on January 15,  2010, laundered by and through Jemco;

p.  $3,100 kickback on January 22, 2010, laundered by and through Jemco;

q.  $3,100 kickback on February 5, 2010, laundered by and through Jemco;

r.  $3,100.62 kickback on February 12, 2010, laundered by and through Jemco;

s.  $3,100 kickback on February 19, 2010, laundered by and through Jemco;

t.  $7,440 kickback on February 19, 2010, ;laundered by and through Jemco;

u.  $3,100.62 kickback on March 5, 2010, laundered by and through Jemco;

v.  $3,110.62 kickback on April 23, 2010, laundered by and through Jemco;

w.  $3,125 kickback on April 30, 2010, laundered by and through Jemco;

x.  $3,100 kickback on May 21, 2010, laundered by and through Jemco;

y.  $3,105.62 kickback on May 28, 2010, laundered by and through Jemco;

z.  $3,110 kickback on June 4, 2010, laundered by and through Jemco;

aa. $3,110.62 kickback on June 11, 2010, laundered by and through Jemco;

bb. $3,110 kickback on June 18, 2010, laundered by and through Jemco;

cc. $3,110.62 kickback on June 28, 2010, laundered by and through Jemco;

dd. $3,110 kickback on July 2, 2010, laundered by and through Jemco;

ee. $3,110.62 kickback on July 9, 2010, laundered by and through Jemco;

ff. $3,115.62 kickback on July 15, 2010, laundered by and through Jemco;

gg. $3,115,62 kickback on July 30, 2010, laundered by and through Jemco;

hh. $3,115 kickback on August 5, 2010, laundered by and through Jemco;

ii.  $3,110 kickback on August 12, 2010 laundered by and through Jemco;

jj.  $3,125 kickback ono August 20, 2010, laundered by and through Jemco;

kk. $3,130 kickback on August 26, 2010, laundered by and through Jemco; and

ll.  $3,135 kickback on September 3, 2010, laundered by and through Jemco.

54.  In addition to these kickbacks All Star pays, and American Bank receives and accepts, kickbacks for the assignment and referral of American Bank loans from the American Bank

Nottingham Branch of unknown amounts laundered by and through third party marketing companies including:

    a.  An unknown amount on September 20, 2010, laundered by and through Jemco;

    b.  An unknown amount on November 10, 2010, laundered by and through Jemco;

    c.  An unknown amount on February 25, 2011, laundered by and through Jemco,  and

    d.  An unknown amount on March 4, 2011 laundered by and through Jemco.

55.    All Star's laundering of payments through Jemco and Influence Direct, for the benefit of the American Bank is expressly payment for the referral of American Bank loans by the American Bank Nottingham Branch to All Star and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

56.    After receiving and accepting the kickback, American Bank chooses to use the kickbacks to produce and mail American Bank solicitations to potential borrowers. One purpose of these American Bank solicitations is to generate loans to assign and refer to All Star in furtherance of the Kickback Agreement. American Bank uses the kickbacks to produce and mail more than 100,000 American Bank solicitations to borrowers in virtually every state in the contiguous United States and Alaska.  American Bank chooses to send these American Bank solicitations through the interstate U.S. mails, with the solicitation being printed in one state and mailed to a potential borrower in another state.

57.    At least some of these borrower solicitations include the fraudulent solicitations described in ¶¶ 27-28.  *See, e.g.,* **Exhibit 5.**

58.    The representation in American Bank's solicitation that All Star is American Bank's preferred lender is fraudulent and false because American Bank did not recognize any designation of "preferred title company" and had not conferred any designation on All Star;

17

instead, American Bank was compelled to assign and refer loans to All Star under the Kickback Agreement.

59.   The representation in American Bank's solicitation that the borrowers would "save an additional 30-40%" with All Star is fraudulent and false because the prices American Bank and All Star charged borrowers were not discounted or lower by any percent and in fact were higher and unnecessarily increased for the purpose of funding the kickbacks.

60.   The representation in American Bank's solicitation that it recommends All Star because its prices were lower is false and fraudulent because American Bank was recommending All Star for the purpose of obtaining a kickback and in furtherance of the concealed kickback and referral agreement, and not for any reason associated with market-related pricing.

61.   One purpose of these fraudulent borrower solicitations was to defraud American Bank borrowers into paying fixed and unnecessarily increased title and settlement service fees, fund the kickbacks, and ensure that the kickbacks continued.

62.   In early 2009, American Bank and All Star conspire and agree to fix the prices charged borrowers assigned and referred from the American Bank Nottingham Branch at $1,500 including title for streamline refinances and $1500 plus title for those loans that are not streamlines. *See*  Jan. 7, 2009 email between S. Smith and J. Horwitz attached as **Exhibit 6;** Feb. 11, 2009 email between J. Horwitz and All Star loan processor C. Smith attached as **Exhibit 7.**

63.   These charges are at least $100 higher than All Star is charging on loans assigned and referred from other lenders participating in the All Star Scheme and represents the American Bank Overcharge. *See* Feb. 10, 2009 Email between J. Horwitz and C. Zimmerman relating to fixed prices with Chesapeake Mortgage Funding attached as

**Exhibit 8.**   In addition, these charges include a minimum $100 that is charged for the sole purpose of funding the kickbacks ("Kickback Overcharge") and not associated with any legitimate title or settlement service.  These American Bank and Kickback Overcharges are the minimum amount of actual damages incurred by American Bank borrowers assigned and referred during this period pursuant to the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity undertaken in furtherance of the All Star Scheme.

64.   Just a few months later, American Bank and All Star raise the fixed prices charged borrowers on loans assigned and referred from Ray Notaro, a loan officer American Bank employs in the American Bank Nottingham Branch, to $2000. *See* April 16, 2009 email between R. Notaro and J. Horwitz attached as **Exhibit 9.**

65.   These charges are at least $600 higher than All Star is charging borrowers assigned and referred by other lenders participating in the All Star Scheme and represent the American Bank Overcharge. These charges also include a minimum $500 Kickback Overcharge, charged for the sole purpose of paying for the kickbacks and not associated with any legitimate title or settlement service. These American Bank and Kickback Overcharges are the minimum amount of actual damages incurred by American Bank borrowers assigned and referred during this period pursuant to the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity undertaken in furtherance of the All Star Scheme.

66.   It is clear from the beginning that All Star is paying the kickbacks in exchange for the referral of loans and American Bank's loan officers understand the payment is for the referral of loans:

From: Jason
Sent: Wednesday, April 22, 2009 10:42 AM EDT
To: rnotaro@americanfsb.com
Subject: RE: New Mailer

sent everything to Richard at Red Clay, we should be all set!

From: Raymond Notaro [mailto:rnotaro@americanfsb.com]
Sent: Tuesday, April 21, 2009 5:52 PM
To: Jason
Subject: FW: New Mailer

Jay,
Just wanted to forward you a copy of the mailer that is going out.  All 2500 are being sent to NC.  Should
be a good one!!!  I attached the invoice as well.  Let me know if you have any problems.  The email below
from the data place says that the payment is due by 10 am tomorrow.  They usually give us til Thursday,
but I think they have a lot to process this week.  Thanks again and I think this could be the start of
something Great!  I appreciate your confidence in my ability and do trust that all loans are coming your
way!  Thanks alot!

Raymond Notaro
FHA/VA Expert

American Bank Mortgage Group
8727 Belair Road
Nottingham, MD 21236

*See* April 22, 2009 Email between R. Notaro and J. Horwitz attached as **Exhibit 10.**

67.     As the word of the kickbacks spread, American Bank loan officers clamor to take
advantage of the Kickback Agreement, and demonstrate the understanding that the
kickbacks are paid as a quid pro quo for the referral of American Bank loans:

From: James Ventura [mailto:jventura@americanfsb.com]
Sent: Thursday, November 05, 2009 3:30 PM
To: Jason
Subject: New Business

Hi Jason,

My name is James Ventura, I work with Brian at American Bank.  All-Star was one of the names that came up when
we were discussing who I should use for my title.  I have been sending my deals to CTC in exchange for mail, but
they don't do pre-signings.  Brian would prefer I use a company that does.  To be candid, it doesn't much matter who
I use as long as I can make some mailer arrangements.  I was scheduled to have a piece drop next week in time for
the FHA changes on Nov 17th.  If you would be willing to do mail for me, I can send you a number of deals today
and everything I get moving forward.  Let me know if you are interested and I'll talk to you soon.

James Ventura
American Bank
800-684-3030
410-746-6219 (cell)

Nov. 5, 2009 email from J. Ventura to J. Horwitz attached as **Exhibit 11.**

68.   In May 2010, Just a few months later, American Bank and All Star raise the fixed prices charged borrowers on loans assigned and referred from the American Bank Nottingham Branch to $1,750. *See* May 24, 2010 email between American Bank loan officers and J. Horwitz attached as **Exhibit 12.**

69.   These charges are at least $600 higher than All Star is charging borrowers assigned and referred by other lenders participating in the All Star Scheme and represent the American Bank Overcharge. These charges also include a minimum $500 Kickback Overcharge, charged for the sole purpose of paying for the kickbacks and not associated with any legitimate title or settlement service. These American Bank and Kickback Overcharges are the minimum amount of actual damages incurred by borrowers on  American Bank loans assigned and referred during this period pursuant to the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity undertaken in furtherance of the All Star Scheme.

70.   Throughout this time period, American Bank and All Star acknowledge that the  kickbacks are being paid in exchange for the referral of American Bank loans:

> "Batterden@aol.com" <Batterden@aol.com> wrote:
>
> Hi Jason,
>
>
> I completely understand if you don't want to pay for the mail.
> This will pick up in the next few weeks. I thought you were
> going to give this another thirty days based on our
> conversation Friday.
>
> What I think makes sense is to pay about half of what you've been
> or somewhere in that range. If you don't want to that's fine.
> This situation cant be judged by the last two months or when it  was real
> busy.
> You should be able to get about 15-20 deals a month from here
> starting now so that should be how to base your decision.
>
> Thanks for all your help.
>
>
> BB

Feb. 25, 2011 email from B. Batterden to J. Horwitz attached as **Exhibit 13.**

21

71.     In March 2011, American Bank and All Star agree to raise the fixed prices charged American Bank borrowers assigned and referred from the American Bank Nottingham Branch to $2250.  *See* Mar. 15, 2011 email from J. Horwitz to B. Batterden attached as **Exhibit 14 .**

72.     These charges are between $175 to $1,050 higher than All Star is charging borrowers assigned and referred by other lenders participating in the All Star Scheme and represent the American Bank Overcharge. *See*  May 19, 2011 Title Fee Structure Chart attached as **Exhibit 15.**

73.     These charges also include a minimum $500 Kickback Overcharge, is not a typical market charge, and is instead charged for the sole purpose of paying for the kickbacks and not associated with any legitimate title or settlement service. These American Bank and Kickback Overcharges are the minimum amount of actual damages incurred by borrowers on  American Bank loans assigned and referred during this period pursuant to the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity undertaken in furtherance of the All Star Scheme.

74.     In May 2011, American Bank was put on notice by the Veterans Administration ("VA") that the fixed prices American Bank and All Star was charging borrowers violated the requirement that the fees charged are reasonable and customary:

**From:** Mary Carter [mailto:mcarter@americanfsb.com]
**Sent:** Friday, May 13, 2011 1:47 PM
**To:** Dawn Tabler
**Subject:** VA TITLE FEES

Good afternoon Dawn,
        The above loans were recently audited by VA.

VA is stating that based on comparison averages for loans which have closed in these states, the total
title costs charged to the veteran are ABOVE what would be considered "reasonable and customary"
title search/abstract and title insurance fees for these areas.
There for we need you to explain and / or provide evidence for each file, on company letterhead,
supporting why the fees being charged on the final hud 1 are ABOVE the average for this area.
Can you please look into this and email back to me the explanation of these charges asap.
Your prompt attention to this matter is greatly appreciated.
Thank you.

Loan Closer
American Bank
9001 Edmonston Rd. Ste. 199
Greenbelt, Md. 20770
301-572-3774
Fax 301-315-6500
mcarter@americanfsb.com

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.901 / Virus Database: 271.1.1/3635 - Release Date: 05/13/11 02:34:00

May 13, 2011 Email from American Bank employee M. Carter to All Star employee D. Tabler attached as **Exhibit 16.**

75. Beginning in 2009 and through 2011, the American Bank Nottingham Branch assigns and refers more than 800 American Bank loans, secured by property in 34 states, pursuant to the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity in furtherance of the All Star Scheme.

### B. American Bank Performs the Kickback Agreements By and Through Additional American Bank Branches.

76. Based on American Bank's and All Star's continuing pattern of practice, Plaintiffs believe, and therefore allege, that American Bank participates in the All Star Scheme by and through additional known and unknown American Bank branches, branch manager and loan officers, including, without limitation, loan officers, branch managers and others employed by American Bank in the American Bank branches located at: 9001 Edmonston Road, Greenbelt, Maryland; 1526 York Road, Lutherville, Maryland; 9151 Rumsey Road, Columbia, Maryland; and 9400 Key West Avenue, Suite 250, Rockville, Maryland.

Additional American Bank employees include, without limitation, Moses Cohen, Erin Grant, Erin Reed, George Brown, and Christian Dale. *See* Aug. 19, 2010 Invoice for kickback paid by All Star related to Christian Dale attached as **Exhibit 17.**

77.     Based on the continuing pattern of practice between All Star and American Bank, Plaintiffs believe, and therefore allege, that American Bank and All Star launder kickbacks by and through other third-party marketing companies in addition to those identified herein, including, without limitation, Lendanear Data & Direct Mail Services, a Tennessee based leads and mail marketing company.

78.     As a result of American Bank's performance of the Kickback Agreement, the agreements fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme,  American Bank borrowers, including Plaintiffs and alleged Class Members, are harmed because they are: (a) defrauded into being charged and paying amounts that are not related to any legitimate title and settlement services; (b) charged and pay higher and unnecessarily increased amounts for title and settlement services that they would have without the Kickback Agreement, fixed prices,  and the pattern of racketeering activity conducted  in furtherance of the All Star Scheme; (c) denied kickback free title and settlement services, and (d) are denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

79.     In each instance and as part of the overall All Star Scheme, the payments made by All Star which are laundered through third party marketing companies were express payments for the referral of borrowers by American Bank to All Star and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

80.     As a result of American Bank's performance of the Kickback Agreement and the pattern
        of racketeering activity All Star and American Bank conduct in furtherance of the All Star
        Scheme, American Bank borrowers, including Plaintiffs and alleged Class Members, are
        harmed because they are defrauded into being charged and paying amounts not associated
        with any title and settlement service and solely to pay for the illegal kickbacks, are required
        to pay unnecessarily increased fees designed to pay for the illegal kickbacks, are denied
        kickback free title and settlement services, and are denied their choice of title and
        settlement service provider and other consumer benefits of a competitive marketplace.

81.     No good, facilities, or  services are provided by any of American Bank employees and/or
        agents, associated with the receipt and acceptance of the kickbacks.  The payment by All
        Star and the receipt and acceptance by American Bank of the kickbacks are made expressly
        and solely for the assignment and referral by American Bank of American Bank borrowers
        to All Star.

82.      In furtherance of the "co-marketing" sham integral to the All Star Scheme, All Star is
        nominally in included in the American Bank borrower solicitations identified above and at
        other times not included. But, consistent with All Star's early prototypes, advice to other
        Participating Lenders and the overall All Star Scheme, no phone number or other contact
        information is included on any American Bank solicitation and All Star is included in only
        a nominal way, if at all. *See* **Exhibit 5.**

83.     True to its design and intent, All Star does not receive any marketing benefit from any
        American Bank solicitation. Instead, borrowers contact American Bank branch managers,
        loan officers and other employees who assign and refer  the American Bank borrower's

loan to All Star under the Kickback Agreement and for the purpose of receiving the next kickback.

84.     In addition, and in the alternative, any payment from All Star to American Bank is not reasonably related to the value of any good, facility or service that may have been provided by American Bank to All Star.  As Jason Horwitz, All Star's owner and mastermind of the All Star Scheme, recognized with another Participating Lender:

On Mar 4, 2010, at 3:59 PM, "Jason" <jason@allstartitleinc.com> wrote:

haha, uhh i was thinking the All Star part was a little more visible...lol i almost couldnt find it!
Maybe next time we'll see how we can change it to maybe make our portion a little bigger or
something...

**From:** Angela Pobletts [mailto:Angela.Pobletts@enmcdirect.com]
**Sent:** Thursday, March 04, 2010 3:46 PM
**To:** Jason
**Subject:** Fwd: Eagle Proof 35163 revision 3

Mar. 4, 2010 email between A. Pobletts and J. Horwitz, attached as Exhibit 25. .

85.     Because the payments by All Star are solely for the assignment and referral of loans by American Bank pursuant to the Kickback Scheme and/or not reasonably related to the value of any purported good, facility or service provided to All Star by American Bank, the payments are not entitled to the protection of 12 U.S.C. §2607(c)(2).

**FACTUAL ALLEGATIONS RELATED TO
THE INDIVIDUAL CLASS REPRESENTATIVE**

**I.      Plaintiff Ekstrom Loan**

67.     On or about December 2010, Plaintiff Timothy Ekstrom obtains a residential mortgage loan from American Bank through the American Bank Nottingham Branch, in relation to the refinance of residential real property located at 5651 Harbor Valley Drive, Brooklyn, Maryland, 21225.  Ekstrom's American Bank loan closes on or about December 9, 2010.

68.     Courtney Judge, an American Bank employee in the American Bank Nottingham Branch, assigns and refers the Ekstrom American Bank loan to All Star as quid pro quo for the kickbacks All Star paid American Bank in November, 2010, as described in ¶54, thereby performing the Kickback Agreement, depriving Ekstrom of his choice of title and settlement service provider and denying Ekstrom kickback-free title and settlement services.

69.     American Bank and All Star charge Ekstrom the agreed fixed price of $1,750 in total title and settlement service fees, thereby perform the agreement on fixed prices. The price for title and settlement service fees American Bank and All Star charge Ekstrom are the result of an agreement to fix prices, unnecessarily increased, and higher than the same charges would have been without the Kickback Agreement, the price fixing agreement, and the pattern of racketeering activity All Star and American Bank conduct in furtherance of the All Star Scheme.

70.     These title and settlement service fees include the $600 American Bank Overcharge and $500 Kickback Overcharge described in ¶65 which is the minimum amount of Ekstrom's actual damages resulting from the All Star Kickback Agreement, agreement fixing prices and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme.

71.     Ekstrom believes and therefore alleges that All Star disburses proceeds from Ekstrom's American Bank loan in payment of these title and settlement service charges.

72.     As a direct and proximate result of the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme, Ekstrom is harmed because he was: (i) charged and paid

unnecessarily increased and higher title and settlement services fees than he would have paid without the illegal Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme; (ii) was defrauded into being charged and paying higher prices for title and settlements service fees unnecessarily increased by amounts not associated with any legitimate title and settlement service; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

73.     As a direct and proximate result of the agreement Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme, Ekstrom suffered actual damages in the amount of at least $1,100 and, on information and belief, additional amounts.

**II.     The Carnahan Loan**

74.     On or about December 2010, Plaintiff Davida Carnahan obtains a residential mortgage loan from American bank through Amy Smith, a loan officer employed by American Bank in the American Bank Nottingham Branch, in relation to the refinance of a loan secured by real property located at 1131 Sailfish Court, Churchton, Maryland.   The Carnahan American Bank loan closes on or about December 9, 2010. *See* **Exhibit 18**, Carnahan HUD-1.

75.     Smith assigned and referred the Carnahan American Bank loan to All Star in performance as quid pro quo for the kickbacks All Star paid to American Bank in November 2010, thereby performing the Kickback Agreement, depriving Plaintiff Carnahan  of her choice

of title and settlement service provider and denying Plaintiff Carnahan kickback-free title and settlement services.

76.     All Star charges Plaintiff Carnahan $1,750 in total title and settlement service fees, thereby performing the agreement on fixing prices.  *See* **Exhibit 18,** Carnahan HUD-1. These fees include an approximately $600 American Bank Overcharge and $500 Kickback Overcharge as described in ¶65 and constitutes the minimum amount of Plaintiff Carnahan's actual damages proximately caused by the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme.

77.     All Star disburses proceeds from the Carnahan American Bank loan in payment of these charges, as reflected on Plaintiff Carnahan's HUD-1. *See* **Exhibit  18**.

78.     As a direct and proximate result of the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme,  Plaintiff  Carnahan is harmed because she is: (i) charged and pays higher and unnecessarily increased title and settlement services fees than she would have without the illegal Kickback Agreement, the agreement fixing prices,  and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme; (ii) is defrauded into being charged and paying higher and fixed prices for title and settlements service fees unnecessarily increased by amounts not associated with any legitimate title and settlement service; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

79.     As a direct and proximate result of the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity American Bank and All Star conduct in furtherance of the All Star Scheme, Plaintiff Carnahan suffers actual damages in the amount of at least $1,100 and, on information and belief, additional amounts.

80.     Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback Agreement, the agreement fixing prices and the All Star Scheme and are typical of all alleged Class Members' transactions.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

81.     Essential to the All Star Scheme, American Bank and All Star undertake affirmative acts that fraudulently conceal the Kickback Agreement, the illegal kickbacks, the related fixed prices and overcharges, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

**I.      All Star and American Bank Launder Kickbacks through Third Party Marketing Companies and create sham invoice and payment records.**

82.     As described in ¶¶18-21, 32-33 above, American Bank and All Star choose to conceal the fact and payment of kickbacks by All Star to American Bank by laundering kickbacks through third party marketing companies such as Jemco, Influence Direct and Lendanear. Laundering the kickbacks through third party marketing companies conceals the fact that any thing of value is exchanged between All Star and American Bank related to the assignment and referral of American Bank loans, including Plaintiffs' and Class Members' American Bank loans.

83.     For most, if not all, of the kickbacks payments laundered through a third party marketing company, American Bank and All Star cause the third party marketing company to issue a sham invoice to All Star.  These invoices are a sham, and fraudulent, because these invoices

falsely portray that All Star is receiving marketing services from the third party marketing company in exchange for the payments. *See* collection of sham invoices related to the kickbacks paid American Bank attached as **Exhibit 19.** In fact, Jason Horwitz, All Star's owner, concedes that the marketing is "for them" – Participating Lenders - not All Star, and is clear that the benefit that All Star Title was to receive is the assignment and referral of loans from Participating Lenders, including American Bank. *See* **Exhibit 4.**

84. These invoices, and the related payment records, are false because All Star is not receiving any marketing services from the third party marketing company, the payment is a kickback made solely and exclusively in exchange for the referral of loans, .and All Star's payment to the third party marketing company is applied for the sole benefit of American Bank.

85. This false record conceals the kickbacks, Kickback Agreement and All Star Scheme from any person who may examine All Star's financial records including auditors, regulators, law enforcement or borrowers.

## II.   American Bank and All Star Falsely Allocate Fees and Manipulate the APR.

86. The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees. The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate. Lenders are

required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

87.    The title and settlement service fees that are excluded in the APR calculation are defined by TILA. 12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

88.    As a regular and continuing business practice, American Bank and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on American Bank borrowers' loan documents and required federal disclosures.

89.    For example, "fees for title examination, abstract of title, [and] title insurance" are excluded from the APR calculation – *see* 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee and an application signing fee are settlement service costs required to be included in the APR calculation. *See* 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated to conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result would be a false, and falsely minimized, APR.

90.    All Star claims the false allocation of fees and manipulation of the APR as a regular business practice, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR. *See, e.g.*, June 6, 2011 E-mail, attached as **Exhibit 20**; Sept. 24, 2015 E-mail, attached as **Exhibit 21**; October 6, 2015 E-mail, attached as **Exhibit 22**.

91.    American Bank participate in and ratify this false allocation of fees.  *See* Oct. 14, 2011
       email between American Bank loan officer R. Bridges and All Star loan processor H. Reid
       attached as **Exhibit 23;** Oct. 21, 2010 email between American Bank loan officer B.
       Caldwell and All Star loan processor R. Brown attached as **Exhibit 24.**  Based on this
       continuing pattern of practice, Plaintiffs believe, and therefore allege, that American Bank
       and All Star  engage in the false allocation and manipulation of the APR throughout the
       time period American Bank is participating in the All Star Scheme.

92.    For example, despite conducting a settlement or closing with each American Bank
       borrower, American Bank chooses to not allocate any amount of All Star's charges
       associated with a borrower's loan to "settlement or closing fee" because that charge is
       included in the APR.  Instead, All Star and American Bank allocate all charges, including
       that portion attributable to conducting a settlement or closing, to "Title Exam" or
       "Abstract", which are excluded from the APR.  *See, e.g.,* **Exhibit 18,** Carnahan HUD-1.

93.    American Bank's and All Star's choice to falsely allocate fees results in the fraudulent
       reporting of false APR's and the false, and falsely minimized, representation of the cost of
       the loan to American Bank's borrower.

94.    American Bank, and All Star's choice to falsely allocate fees and fraudulently report these
       false allocations in borrowers' loan documents concealed from American Bank borrowers
       the artificially inflated prices of title and settlement services resulting from the Kickback
       Agreements and prevented borrowers from discovering the fixed nature of the pricing
       through comparison to American Bank' and All Star's competitors.

95.    As a regular business practice, All Star uses various software programs, including
       "Titlehound," to produce borrower loan documents, including documents reporting the

APRs associated with a loan.  All Star causes this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce American Bank' loan documents to present to borrowers and on which American Bank, and All Star intend borrowers rely.

96.  American Bank' and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from American Bank borrowers the coordinated business relationships between All Star and American Bank under the Kickback Agreement, the higher prices for title and settlement services resulting from the Kickback Agreement and the related agreement fixing prices, and the pattern of racketeering activity American Bank perform with All Star in furtherance of the All Star Scheme, and affirmatively prevented American Bank borrowers from discovering their injuries resulting therefrom.

**III.  False Representations in American Bank Borrowers' Loan Documents.**

97.  American Bank and All Star also choose to make false representations on borrowers' loan documents.

98.  At all relevant times, federal law required American Bank, as lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b). "The required standardized GFE form must be prepared completely and accurately." 12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

99.  Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance."

100.    As a regular pattern of practice, American Bank each falsely include in Block 4 charges that are not title services and lender's title insurance including the American Bank and Kickback Overcharges, which are not associated with any legitimate title or settlement service and are charged for the sole purpose of funding the illegal kickbacks. *See* **Exhibit 18,** Carnahan HUD-1 at  page 3, comparing charges appearing on Good Faith Estimate and HUD-1 Settlement Statement.

101.    American Bank' choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the illegal kickback; (ii) the fact and amount of the American Bank and Kickback Overcharges; and (iii) the coordinated business relationship between American Bank and All Star under the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity All Star performs with American Bank in furtherance of the All Star Scheme.

102.    In addition, the loan originator must state in Block 1 of the Good Faith Estimate:

> [A]ll charges that loan originators involved in this transaction will receive, except for any charge for the specific interest rate chosen (points).  A loan originator may not separately charge any additional fees for getting this loan, including for application, processing, or underwriting. The amount stated in Block 1 is subject to zero tolerance, *i.e.,* the amount may not increase at settlement.

12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

103.    As a regular pattern of practice, American Bank chose to falsely omit reporting the American Bank and Kickback Overcharges in Block 1 of the Good Faith Estimate even though the American Bank and Kickback Overcharges are charges American Bank would receive in the transaction.

104.    American Bank' choice to falsely omit the American Bank and Kickback Overcharge from
        Block 1 of the "Good Faith" Estimate conceals from borrowers: (i) the fact and amount of
        the American Bank and Kickback Overcharges; (ii) the illegal kickbacks, and (iii) the
        coordinated business relationship between American Bank and All Star  under the
        Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity
        All Star performs with American Bank  in furtherance of the All Star Scheme.

105.    In addition to the Good Faith Estimate, federal law, at all relevant times, requires each
        borrower to receive a HUD-1 Settlement Statement at the closing or settlement of a loan.
        The settlement agent produces the HUD-1, but federal regulations require the loan
        originator to provide to the settlement agent all information appearing in the HUD-1
        statement.

106.    Section 1100 of the HUD-1 reports to the borrower the title and settlement services
        provided on the loan, along with the associated charges to the borrowers for those services.

107.    As a continuing pattern and regular business practice, American Bank and All Star choose
        and cause the false allocation of fees described in ¶¶ 120-130 to repeat and appear on
        American Bank borrowers' HUD-1 statements in Section 1100.

108.    As a continuing pattern and regular business practice, American Bank chooses to omit and
        fails to describe anywhere on a borrower's HUD-1 statement the amount of the kickback
        received by American Bank related to the borrower's loan or the fact that All Star has paid
        a kickback to American Bank for the assignment and referral of the borrower's loan.
        American Bank is required to report the kickback on Line 808 of the HUD-1, and perhaps
        other lines.

109.    As a continuing pattern of practice, American Bank chooses to omit and fail to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any American Bank or Kickback Overcharge or other flat fee associated with the Kickback Agreement and/or the agreement fixing prices.  American Bank is required to itemize these amounts in the in Section 1100 or Section 1300 of the HUD-1. Instead, American Bank choose to omit any description of the American Bank and Kickback Overcharges from these sections and fraudulently lump the amount of the American Bank and Kickback Overcharges into the amounts associated with legitimate title and settlement services, such as title examination and/or abstract. This is fraudulent because the American Bank and Kickback Overcharges are not associated with any legitimate title and settlement service and charged solely for the purpose of paying for illegal kickbacks.

110.    Lenders authorized to underwrite government insured or guaranteed loans – such as VA or FHA loans -  use charts produced by the Department of Housing and Urban Development ("HUD") listing the Mean, Median, and 80th percentile of settlement services charges by state to measure a "reasonable and customary" settlement service fee per 24 C.F.R. § 203.27.

111.    These authorized lenders require their mortgage broker correspondents and wholesalers, like American Bank, to follow these charts.

112.    828 of the 847 loans assigned and referred by American Bank to All Star during the time period of the All Star Scheme – 98% -  were VA or FHA loans. American Bank was required to certify that the charges on these loans complied with these guidelines per 24 C.F.R. § 203.27 and 24 C.F.R. § 203.255.   This certification is presented to borrowers on the "Direct Endorsement" form.

113.    As a regular business practice, American Bank falsely certified borrowers Direct Endorsement.  These certifications were false because the fees charged borrowers did not comply with HUD regulations because the charges resulting from the Kickback Agreement and agreement fixing prices are unnecessarily increased by the American Bank and Kickback Overcharges, not reasonable and customary, and included amounts not associated with any legitimate title and settlement service.

114.    These false representations and omissions, presented to American Bank borrowers by All Star – as American Bank's agent – at closing, fraudulently conceal: (i) the illegal kickbacks; (ii) the fact and amount of the American Bank and Kickback Overcharges and the fact that borrowers are being charged an amount not associated with a legitimate title and settlement service; (iii) the coordinated business relationship between American Bank and  All Star under the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity All Star performs with American Bank  in furtherance of the All Star Scheme and the fact of American Bank's borrowers' actual damages and injury therefrom.

## IV.    Plaintiffs' Reasonable Diligence

115.    As a result of the fraudulent concealments by American Bank, American Bank, and All Star, Plaintiffs Ekstrom and Carnahan (and all members of the alleged Class) had no actual notice before, at or after the closing of their American Bank loans of the illegal kickbacks, the exchange of any thing of value between American Bank and All Star related to their American Bank loan, the resulting American Bank and Kickback Overcharges, or the coordinated business relationship of American Bank and All Star under the Kickback

Agreement, the agreement fixing prices, and the pattern of racketeering activity All Star performs with American Bank  in furtherance of the All Star Scheme.

116.    Plaintiffs exercised reasonable diligence before, during and after the closing of their loans.

### A. Plaintiff Ekstrom's Reasonable Diligence.

117.    Plaintiff Ekstrom receives loan documents prepared by American Bank in advance of his closing and reviews those loan documents.

118.    Plaintiff Ekstrom believes, and therefore alleges, that his pre-closing loan documents include a "Good Faith" Estimate prepared by American Bank.

119.    American Bank choose to omit from his "Good Faith" Estimate any description or statement of the coordinated business relationship between American Bank and All Star and to include the fraudulent representations and omissions described in ¶¶ 98-104. Plaintiff Ekstrom believes and therefore alleges that his "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to his refinance.

120.    American Bank choose to include in his pre-closing documents the false allocation of fees and a false APR as described in ¶¶ 86-96.  Plaintiff Ekstrom's belief is supported by the allocation of fees in his HUD-1, which is consistent with American Bank' and All Star's pattern of false allocation of fees and false statement of the APR.

121.    American Bank makes the false statements and omissions in Plaintiff Ekstrom's pre-closing loan documents for the purposes of concealing, and did so conceal from Plaintiff Ekstrom, the coordinated business relationship between American Bank and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to Plaintiff Ekstrom's loan, the agreement fixing prices and the fixed nature of prices charged Plaintiff Ekstrom for title and settlement services.

122.   As is reasonable under the circumstances, Plaintiff Ekstrom believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Ekstrom did not believe, that: (i) a coordinated business relationship exists between American Bank and All Star; (ii) there has been any payment or exchange of a thing of value between American Bank  and All Star related to the assignment and referral of Plaintiff Ekstrom's loan for title and settlement services; or (iii) the prices he will be charged for title and settlement services are the result of Kickback Agreement between American Bank and All Star and the pattern of racketeering activity All Star and American Bank conduct in furtherance of the All Star Scheme.

123.   Plaintiff Ekstrom acts diligently during the closing or settlement of his loan.  As a condition of funding his loan, American Bank require Plaintiff Ekstrom to participate in a closing, and he attends and fully participates in the required closing.

124.   At the closing of his loan, Plaintiff Ekstrom receives from All Star, or its agent, all of the loan documents required by American Bank to close his loan, including a HUD-1.

125.   Plaintiff Ekstrom believes, and therefore avers, that American Bank and All Star choose to omit from the documents Plaintiff Ekstrom receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between American Bank and All Star under the Kickback Agreement and/or agreement fixing prices.

126.   American Bank and All Star choose to omit from the documents Plaintiff Ekstrom receives at closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to American Bank, or received by American Bank from  All Star,  related to Plaintiff Ekstrom's loan.

127.   American Bank and All Star choose to include in the documents Plaintiff Ekstrom receives at closing, including his HUD-1, the false allocation of fees as described in ¶¶86-96  and the resulting fraudulent representations and omissions as described in ¶¶105-109

128.   American Bank chose to include in the documents Plaintiff Ekstrom receives at closing the false certification described in ¶¶ 110-114.

129.   American Bank and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Ekstrom's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Ekstrom, the coordinated business relationship between American Bank and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickback related to Plaintiff Ekstrom's loan, the agreement fixing prices, the American Bank and Kickback Overcharges, and Plaintiff Ekstrom's injuries and actual damages therefrom.

130.   As is reasonable under the circumstances, Plaintiff Ekstrom believes these closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Ekstrom does not believe, that: (i) a coordinated business relationship exists between American Bank and All Star; (ii) there has been any payment or exchange of a thing of value between American Bank and All Star related to the assignment and referral of Plaintiff Ekstrom's loan for title and settlement services; (iii) include the American Bank and Kickback Overcharges or any other amount not associated with any legitimate title and settlement service; or (iv) the prices charged for title and settlement services are fixed and the result of Kickback Agreement between American Bank and All Star, the related agreement fixing prices and the pattern of racketeering activity All Star and American Bank conduct in furtherance of the All Star Scheme.

41

131.    Plaintiff Ekstrom acts diligently after his closing. On or about June 10, 2019, Plaintiff Ekstrom receives a letter from undersigned counsel describing an investigation of American Bank and All Star.  This is Plaintiff Ekstrom's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

132.    Within days, Plaintiff Ekstrom contacts and retains counsel. Plaintiff Ekstrom files this Complaint within a year of becoming aware of facts giving rise to his causes of action.

   **B.  Plaintiff Carnahan's reasonable diligence.**

133.    Plaintiff Carnahan receive loan documents prepared by American Bank in advance of their closing and review those loan documents.

134.    Based on the amounts reported on her HUD-1 settlement statement, Plaintiff Carnahan alleges that her pre-closing loan documents include a "Good Faith" Estimate prepared by American Bank.

135.    American Bank choose to omit from Plaintiff Carnahan's "Good Faith" Estimate any description or statement of the coordinated business relationship between American Bank and All Star and to include the fraudulent representations and omissions described in ¶¶98-104. Plaintiff Carnahan believes and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

136.    American Bank choose to include in their pre-closing documents American Bank and All Star's false allocation of fees and a false APR as described in ¶¶86-96. Plaintiff Carnahan's belief as to the allocation of fees reflected on the "Good Faith" Estimate is supported by the allocation of fees on Plaintiff Carnahan's HUD-1, which is consistent with All Star and American Bank' pattern of false allocation of fees and resulting false APR.  *See* Carnahan HUD-1, **Exhibit 18.**

137.   American Bank makes the false statements and omissions in Plaintiff Carnahan's pre-closing loan documents for the purposes of concealing, and did so conceal from Plaintiff Carnahan,  the coordinated business relationship between American Bank and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to the Plaintiff Carnahan's American Bank loan, the agreement fixing prices and the fixed nature of prices charged Plaintiff Carnahan for title and settlement services.

138.   As is reasonable under the circumstances, the Plaintiff Carnahan believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Carnahan did not believe, that: (i) a coordinated business relationship exists between American Bank and All Star; (ii) there has been any payment or exchange of a thing of value between American Bank  and All Star related to the assignment and referral of Plaintiff Carnahan's loan for title and settlement services; or (iii) the prices she will be charged for title and settlement services are the result of Kickback Agreement and/or price fixing agreements between American Bank and All Star and the pattern of racketeering activity All Star and American Bank conduct in furtherance of the All Star Scheme.

139.   Plaintiff Carnahan acts diligently during the closing or settlement of their loan.  As a condition of funding their loan, American Bank require Plaintiff Carnahan to participate in a closing, and Plaintiff Carnahan attends and fully participates in the required closing and review all documents with All Star's representative.

140.   At the closing of her loan, Plaintiff Carnahan receives from All Star, or its agent, all of the loan documents required by American Bank to close Plaintiff Carnahan 's American Bank

loan, including a HUD-1. Plaintiff Carnahan reviews and signs all of the documents All Star presents at the closing, including the HUD-1.

141. American Bank and All Star choose to omit from the documents Plaintiff Carnahan receives at closing, including her HUD-1, any description or statement of the coordinated business relationship between American Bank and All Star under the Kickback Agreement and/or agreement fixing prices. *See* **Exhibit 18**.

142. American Bank and All Star choose to omit from the documents Plaintiff Carnahan receives at closing, including her HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to American Bank, or received by American Bank from All Star, related to Plaintiff Carnahan's American Bank loan. *See* **Exhibit 18**.

143. American Bank and All Star choose to include in the documents Plaintiff Carnahan receives at closing, including her HUD-1, the false allocation of fees as described in ¶¶86-96 and the resulting fraudulent representations and omissions as described in ¶¶105-109.

144. American Bank choose to include in Plaintiff Carnahan's loan documents presented at closing the false certification described in ¶¶110-114.

145. American Bank and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Carnahan's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Carnahan, the coordinated business relationship between American Bank and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickback related to Plaintiff Carnahan's loan, the fixed nature of the prices charged for title and settlement services, and Plaintiff Carnahan's injuries and actual damages therefrom.

146.    As is reasonable under the circumstances, Plaintiff Carnahan believes these closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Carnahan does not believe, that: (i) a coordinated business relationship exists between American Bank and All Star; (ii) there has been any payment or exchange of a thing of value between American Bank and All Star related to the assignment and referral of Plaintiff Carnahan's American Bank loan for title and settlement services; (iii) include the American Bank and Kickback Overcharges or any other amount not associated with any legitimate title and settlement service; or (iv) the prices charged for title and settlement services are fixed and the result of Kickback Agreement between American Bank and All Star, the related agreement fixing prices  and the pattern of racketeering activity All Star and American Bank conduct in furtherance of the All Star Scheme.

147.    Plaintiff Carnahan acts diligently after her closing. On or about June 10, 2019, Plaintiff Carnahan receives a letter from undersigned counsel describing an investigation of All Star and American Bank.  This is Plaintiff Carnahan's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

148.    Within days, Plaintiff Carnahan contacts and retains counsel.  Plaintiff Carnahan files  this Complaint within a year of becoming aware of facts giving rise to their causes of action.

## V.    Accrual and Tolling of Limitations

149.    The limitations period provided in 15 U.S.C. §15(b), applicable to claims pursuant to 18 U.S.C. §1964**,** is subject to the discovery of injury rule.  *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. LEXIS 4626.  American Bank's  affirmative and fraudulent acts precluded American Bank borrowers, including Plaintiffs and Class

Members, from discovering their actual damages and injuries caused by the pattern of racketeering activity that American Bank and All Star conduct in furtherance of the All Star Scheme.

150.    As a result, Plaintiffs', and Class Members', claims pursuant to 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for Plaintiffs on or about June 10, 2019.

151.    In addition and in the alternative, as a result of American Bank' and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein, for Plaintiffs  on or about June 10, 2019.

152.    Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback Agreement and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to fraudulent concealment tolling of applicable limitations period.

## COUNT I
## Violation of the Real Estate Settlement Procedures Act (RESPA),
## 12 U.S.C. § 2607(a)

153.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

154.    All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

155. American Bank, by and through their brokers, loan officers, employees and/or agents, received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

156. All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by American Bank and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

157. The payment and/or arranging of payment of kickbacks to American Bank by All Star and American Bank's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

158. The payments from All Star to American Bank were not associated with any goods, facility or service actually provided by American Bank, or any of its agents and/or employees, to All Star, and in addition or in the alternative, the value of any good, facility or service provided claimed to be provided by American Bank to All Star is not reasonably related to the payment from All Star such that the payment is not "bona fide" or within the protection of 12 U.S.C. §2607(c)(2).

159. In addition, All Star's laundering of money through the third party marketing companies was always solely expressly payments to American Bank for the assignment and referral of American Bank loans and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

160. In the alternative, any payment made by All Star to American Bank and/or laundered through any third party marketing company is far greater, and not reasonably related, to

All Star's nominal presence in the solicitations and were in reality simply kickbacks designed to look like legitimate payments.

161.  As successor in interest to American Bank, Congressional Bank is liable for American Bank's RESPA violations pled herein under the law controlling the merger described in ¶11, general successor liability principles, and, on information and belief, the express terms of the merger agreement.

162.  Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by American Bank for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2009, and December 31, 2011. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2011, was an employee, officer, member and/or agent of American Bank, Congressional Bank or All Star Title, Inc.

(the "RESPA Class").

163.  There are questions of law and fact common to the claims of each and all members of the RESPA Class.  These common questions include, but are not limited to:

a.  Whether there existed a referral agreement between American Bank and All Star whereby American Bank agreed to assign and refer American Bank loans, refinances and reverse mortgages to All Star in return for kickbacks;

b.  Whether American Bank and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.  Whether the illegal kickbacks to American Bank and its employees and/or agents violated RESPA;

d.   Whether American Bank and All Star used third party marketing companies to launder kickbacks related to American Bank loans;

e.   Whether Plaintiffs and RESPA Class Members were forced to pay higher and unnecessarily increased charges for settlement services;

f.   Whether American Bank used sham invoices and payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.   Whether American Bank disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between American Bank and All Star related to any borrower's loan;

h.   Whether American Bank disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document American Bank' coordinated business relationship with All Star or the fact that a thing of value had been exchanged between American Bank and All Star related to any borrower's loan;

i.   Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel.

j.   Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.   Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

164.   These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

165. Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

166. Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The Plaintiffs' interests and the interests of all other members of the RESPA Class are identical.

167. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class' interests.

168. The RESPA Class consists of borrowers on more than 800 loans, and thus are so numerous that joinder of all members is impracticable.

169. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendant.

170. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

171. Most members of the RESPA Class are unaware of their rights to prosecute a claim against American Bank and/or its successor in interest, Congressional Bank.

172. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT II
## Violations of Racketeer Influenced & Corrupt Organizations Act (RICO)
## 18 U.S.C. §1962

173.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

174.    American Bank  is a "person" for the purposes of 18 U.S.C. §1962(a).

175.    American Bank and All Star associate in fact and form an enterprise (the "Enterprise") for the purpose of 18 U.S.C. § 1962(a).  For a continuous period of at least eighteen months, American Bank and All Star associate and commit the predicate acts pled herein, which acts are separate and in addition to their legitimate mortgage and settlement service operations, for the common purpose of defrauding borrowers into paying higher and fixed prices for title and settlement services. The activities of the Enterprise affect interstate commerce across more than 30 states.

176.    American Bank and All Star associate and perpetrate the All Star Scheme for the purpose of defrauding borrowers into paying fixed and higher prices for title and settlement services related to American Bank loans, and to pay amounts not associated with any legitimate title or settlement services and to thereby deprive borrowers of their money and/or property.

177.    The use of the interstate U.S. Mail and wires by American Bank and All Star in furtherance of the All Star Scheme constitute mail and wire fraud as defined under 18 U.S.C. §§ 1341 and 1343, serve as predicate acts, and constitute a pattern of racketeering activity.

178.    American Bank received income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to American Bank, and through the interest, fees and other income earned on American Bank mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

179.   American Bank improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the activities of the Enterprise and for the purpose of luring borrowers into the All Star Scheme in violation of 18 U.S.C. § 1962(a).

180.   As a direct and proximate result of American Bank' pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $150.

181.   As successor in interest to American Bank, Congressional Bank is liable for American Bank's RICO violations pled herein under the law controlling the Merger identified in ¶11, general successor liability principles, and, on information and belief, the express terms of the merger agreement.

182.   Plaintiffs allege claims pursuant to 18 U.S.C. § 1964(c) on their own behalf and pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by American Bank for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2009, and December 31, 2011.  Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2011, was an employee, officer, member and/or agent of American Bank, Congressional Bank, or All Star Title, Inc.

183.   The RICO Class consists of borrowers on more than 800 loans, and thus are so numerous that joinder of all members is impracticable.

184.   There are questions of law and fact common to the claims of each and all members of the RICO Class.  These common questions include, but are not limited to:

a.   Whether American Bank and All Star formed an enterprise;

b.   Whether the activities of the Enterprise affected interstate commerce;

52

c.  Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

d.  Whether American Bank and All Star used the interstate U.S. Mail in furtherance of the activities of the Enterprise including the All Star Scheme,

e.  Whether American Bank and All Star used the interstate wires in furtherance of the activities of the Enterprise including the All Star Scheme;

f.  Whether American Bank received income from a pattern of racketeering activity;

g.  Whether American Bank used income derived from a pattern of racketeering activity in support of, or in furtherance of, the activities of the Enterprise, including the All Star Scheme;

h.  Whether American Bank actively conceal the All Star Scheme and resulting fixed prices and overcharges;

i.  Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from American Bank' violation of 18 U.S.C. §1962(a);

j.  Whether American Bank' and All Star's fraudulent concealments prevented Plaintiffs and RICO Class members from discovering their injuries proximately caused by American Bank' pattern of racketeering activity;

k.  Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. §1964(c); and

l.  Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. §1964(c).

185.  These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

186.    Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RICO Class Members.

187.    Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

188.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

189.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants.

190.    This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

191.    Most members of the RICO Class are unaware of their rights to prosecute a claim against American Bank and/or its successor in interest, Congressional Bank.

192.    No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

        a.    This Court certify the RESPA and/or RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b.  Judgment for Plaintiffs and RESPA Class Members against Congressional Bank, as successors in interest to American Bank, and award Plaintiffs and RESPA Class Members an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.  Demand judgment for Plaintiffs and RICO Class Members against Congressional Bank, as successors in interest to American Bank, and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by American Bank's scheme to defraud and pattern of racketeering activity conducted in furtherance thereof;

d.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and/or 18 U.S.C. §1964(c); and

e.  For such other and further relief as this Court deems proper.

Dated:  June 5, 2020,                                   Respectfully submitted,

_____/s/_____                  _____/s/_____
Timothy F. Maloney, Esq. #03381               Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679               Melissa L. English, Esq. #19864
Joseph, Greenwald & Laake, P.A.               Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                      600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                     Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)         (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com                    Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                            menglish@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*

**PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

Respectfully submitted,


_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                 600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)    (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                       menglish@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*