IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIMOTHY EKSTROM, *et al.*,

    *Plaintiffs*,

    v.

CONGRESSIONAL BANK,
SUCCESSOR-BY-MERGER TO
AMERICAN BANK

    *Defendant.*

Civil Action No. ELH-20-1501

## MEMORANDUM OPINION

This class action case concerns an alleged kickback scheme between American Bank ("American" or "American Bank") and All Star Title, Inc. ("All Star"), a Maryland based title and settlement services company. Plaintiffs Timothy Ekstrom and Davida Carnahan, who are mortgagors, have sued Congressional Bank ("Congressional"), American Bank's successor-by-merger. ECF 1 (the "Complaint"). The Complaint, which is 56 pages in length, is supported by 24 exhibits. ECF 1-2 to ECF 1-25.

Plaintiffs allege that American made referrals of their loans and the loans of others to All Star for title and settlement services. In exchange, All Star, which is not a defendant, allegedly laundered payments to American, largely through third party marketing companies. As a result of the scheme, plaintiffs allegedly paid inflated settlement fees. In particular, plaintiffs allege that the kickback scheme violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 (Count I) and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count II). *Id.* at 46-56.

Congressional has moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). ECF 14. The motion is supported by a memorandum of law (ECF 14-1) (collectively,

the "Motion") and one exhibit.  ECF 14-2.  Plaintiffs oppose the Motion.  ECF 17.  And, defendant has replied.  ECF 18.

As noted, All Star is not a party to this case.  But, All Star's conduct is at issue here and in other suits in this District.  And, plaintiffs' lawyers in this case are also counsel to plaintiffs in other cases in this District involving All Star.  *See Somerville v. West Town Bank & Trust*, PJM-19-0490; *Remsnyder v. MBA Mortg. Servs., Inc.*, CCB-19-492; *Kadow v. First Federal Bank*, PWG-19-0566; *Walls v. Sierra Pacific Mortgage Co., Inc.*, GLR-19-595; and *Donaldson v. Primary Residential Mortgage, Inc.*, ELH-19-1175.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

# I.  Factual Background[1]

## A.  The Scheme

According to plaintiffs, American, through its agents and employees, "received and accepted illegal kickbacks [from All Star] in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services. . . ."  ECF 1, ¶ 3.  Plaintiffs contend that American "laundered the kickbacks through third party marketing companies" to conceal the scheme, *id.* ¶ 3, and "continuously and regularly

---

[1] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  Further, the Court may consider documents attached to the Complaint or the Motion, "so long as they are integral to the complaint and authentic."  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

The Court cites to the electronic pagination.  This does not always correspond to the pagination that appears in the parties' submissions.

The Complaint contains duplicates of paragraph numbers 67 through 85.  *See* ECF 1 at 20-26, 26-31.  Therefore, citations to those paragraphs include the page number of the Complaint.

used the U.S. Mail and wires," in furtherance of the scheme, "over a period of at [least] three years. . . ." *Id.* ¶ 6.

Plaintiffs allege that since at least 2008, All Star "design[ed] and execut[ed] a scheme…to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, 'Participating Lenders') in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services." *Id.* ¶ 17.  In exchange for "assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services," All Star allegedly paid "kickbacks" to mortgage lenders through third party marketing companies.  *Id.* ¶¶ 17-20.

According to plaintiffs, All Star and the mortgage lenders agreed "to launder the kickbacks through a third party marketing company," which was an "integral part" of the scheme.  *Id.* ¶ 18.  Mortgage lenders "and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use[d] third party marketing companies…to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages."  *Id.* ¶ 19. Under the kickback agreement, the participating mortgage lender receiving the kickback from All Star "identifie[d] a third party marketing company that" the lender was already using for its marketing services.  *Id.* ¶ 20.  Thereafter, All Star made "the kickback payment to the third party marketing company" and the participating lender "receive[d] and accept[ed] the kickback payment when the third party marketing company applie[d] All Star's payment for the benefit of the" lender.  *Id.*

Plaintiffs contend that "All Star's payment laundered through the third party marketing company" constituted "an express payment" for the participating mortgage lender "for the

assignment and referral of loans" because "All Star receive[d] no marketing services from the third party marketing company." *Id.* ¶ 21. Pursuant to the alleged scheme, All Star "charge[d] borrowers amounts not associated with any legitimate title or settlement services and charged solely for the purpose of paying for the illegal kickbacks and other aspects of the illegal referring agreement." *Id.* ¶ 22.

In addition, plaintiffs assert that All Star and participating lenders "regularly use[d] the interstate wires and mails in furtherance" of the scheme. *Id.* ¶ 23. In particular, they "regularly" decided "to transmit, receive and accept the illegal kickbacks over interstate wires." *Id.* ¶ 24. And, they "use[d] the interstate mails and wires to lure borrowers into the All Star Scheme and to defraud borrowers into paying the Kickback Overcharges, and other overcharges." *Id.* ¶ 25.

The participating lenders "cause[d] to be printed direct mail pieces…that encourage[d] borrowers to contact the [mortgage lenders] and apply for a residential mortgage loan, refinance or reverse mortgage." *Id.* ¶ 26. These mailers included "false representations" that, according to plaintiffs, served to "prevent a borrower from fighting a referral to All Star;" "conceal[ed] the Kickback Overcharges resulting from the All Star Scheme;" and, "create[d] the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors." *Id.* ¶ 27.

Further, plaintiffs aver that the participating mortgage lenders also "solicit[ed] borrowers over the telephone." *Id.* ¶ 29. And, plaintiffs contend that "[t]hese borrower solicitation techniques, coupled with the Participating Lender's assignment and referral of loans to All Star under the Kickback Agreement, lured thousands of borrowers into the All Star Scheme." *Id.* ¶ 30.

According to plaintiffs, All Star and the participating lenders "use[d] a variety of tactics to conceal the kickbacks," overcharges, and "coordinated relationship[s]" under the scheme. *Id.* ¶ 31. "Laundering the kickbacks through third party marketing companies…allow[ed] All Star and the Participating Lender to conceal the fact and amount of kickbacks" and "the fact that anything of value was exchanged between" All Star and the lender. *Id.* ¶ 32. As a result, All Star and the lender "create[d] the false impression that All Star [was] making payments for legitimate marketing services" even though they never "receive[d] any legitimate marketing services." *Id.* ¶ 33.

Plaintiffs allege that All Star and the participating lenders "further conceal[ed]" the kickbacks by causing "the third party marketing company to create sham invoices to create the false impression" that All Star was paying for "legitimate marketing services from the third party marketing company." *Id.* ¶ 34. To conceal the overcharges from borrowers, All Star and the participating lenders allegedly made "false and fraudulent representations and omissions in borrowers loan documents, including the Truth in Lending Act ("TILA") Disclosure, the Good Faith Estimate and the HUD-1 Settlement Statement." *Id.* ¶¶ 35, 36.

Moreover, "to add another layer of concealment," plaintiffs maintain that All Star and participating lenders "construct[ed] an elaborate sham to create the false impression that All Star and the Participating Lender [were] 'co-marketing.'" *Id.* ¶ 37. In order to do so, the lenders "agree[d] to nominally include All Star on direct mail solicitations, such as direct mail sent to borrowers." *Id.* ¶ 38. However, the "solicitations [were] a sham," according to plaintiffs, because the mailers were designed to "prevent borrowers from contacting All Star" by omitting any contact information for All Star "to ensure the borrower w[ould] only contact" the participating lender. *Id.* ¶¶ 38, 39.

In 2009, All Star contracted with a postcard company, PostcardMania, to develop a "prototype" for this alleged sham. *Id.* ¶ 40; ECF 1-2 (Emails between All Star and PostcardMania). In developing the prototype, on September 28, 2009, the postcard company advised, ECF 1-2:

> We played around with the design a bit and what we're running into is that if we use 25-50% of the card with All Star Title's info, it makes it confusing for the person receiving the card as they can't tell who the advertisement is from. We came up with a mockup with a smaller All Star Title logo so that it doesn't totally distract from the mortgage company's information. We also removed your phone number because we don't want people to call you instead of the mortgage company.

More than four months later, Jason Horwitz, the President and Owner of All Star, responded to PostcardMania: "We actually started a similar program with other direct mail companies and its [sic] going really really well. I think now would be a really great time to really get this going." *Id.*

Thus, plaintiffs contend that, "by design," All Star did not receive any actual marketing benefit from the solicitations. ECF 1, ¶ 41. Rather, "the entire marketing benefit flow[ed] to the" participating lender. *Id.* And, "[i]n exchange," the lender "agree[d] and [was] required to exclusively assign and refer all loans generated by the mailer to All Star for title and settlement services." *Id.* Therefore, plaintiffs maintain that "the inclusion of All Star on any [solicitation] material at all [was] solely for the purpose of attempting to conceal the kickbacks." *Id.* ¶ 42. And, plaintiffs posit that the "sham solicitations live[d] up to the intended purpose" because All Star did not "receive any marketing benefit" from the solicitations, and "not a single, direct call from a borrower." *Id.* ¶ 43.

According to plaintiffs, All Star made it clear to the participating lenders that All Star's payment to the marketing company was "solely for the assignment and referral of loans for title

and settlement services" and "attache[d] a production goal – referred to as 'unit goal' – for each kickback" paid to a participating lender.  *Id.* ¶ 46.  Horwitz explained the "unit goal" in an email to the "First Administrative Group" at All Star on June 22, 2011, ECF 1-3 at 2:

> [W]hat we're going to, and this really will apply to all marketing campaigns of any significant size, is basically place a "unit goal" on the mail drop…. the "unit goal" can be met with closings from the mail, or any other source. It doesn't [sic] matter where its [sic] from, as long as we hit that unit number. Basically the agreement would be that we do not contribute to another campaign until we hit that unit goal.

In the same email, Horwitz stated that All Star wanted to set the "unit goal" at 30 loans per campaign going forward. ECF 1-3 at 2.  And, Horwitz explained the breakdown of All Star's $1,250 fee: "The $1250 turns into about $1000 (maybe $950 depending on the loan amount) after the title insurance split and marketing contribution.  Then take out $150 for closer, $100 for abstract, and $50 for overnights, wires, etc. and that leaves us with $650-700."  *Id.*

As noted in Horwitz's email, All Star only paid kickbacks after the lender "document[ed] the number and value of the loans assigned and referred to All Star under the Kickback Agreement since the last kickback payment."  ECF 1, ¶ 47.  According to plaintiff, this meant that Horwitz would sometimes "lay down the law."  *Id.*  For example, in an email on February 6, 2013, from Horwitz to Dan Hart, a national account executive at All Star, with the subject "Invoice for marketing," Horwitz said: "Just so we're clear, I'm not dropping $1 more until we close 25 NEW loans."  ECF 1-4; *see also* ECF 1-5 (Email from Horwitz to First Administrative Group, October 11, 2010).

## B.  American Bank

Plaintiffs allege that by "at least 2009" American accepted and received "kickbacks paid by All Star in exchange for the assignment and referral of American Bank loans to All Star for title and settlement services."  ECF 1, ¶¶ 48, 50.  According to plaintiffs, American initially

agreed to refer loans from its branch on Belair Road in Nottingham (the "Nottingham Branch"). *Id.* ¶¶ 51, 53.

From April 2009 until at least September 2010, All Star paid at least 38 kickbacks to American "for the assignment and referral of American Bank loans from" the Nottingham Branch.  *Id.* ¶ 53.  Throughout this period, the Nottingham Branch "assign[ed] and refer[ed] more than 800 American Bank loans [to All Star], secured by property in 34 states, pursuant to the Kickback Agreement, agreement fixing prices, and the pattern of racketeering activity in furtherance of the All Star scheme."  *Id.* ¶ 75.

The kickbacks were "laundered by and through various third party marketing companies," including Red Clay Media, Inc. ("Red Clay"), Jemco Graphic Services, Inc. ("Jemco"), and Influence Direct, and the payments ranged from $1,500 to $4,992.  *Id.* According to plaintiffs, "All Star's laundering of payments through Jemco and Influence Direct, for the benefit of the American Bank [was] expressly payment for the referral of American Bank loans by the American Bank Nottingham Branch to All Star and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star." *Id.* ¶ 55.  And, plaintiffs contend that after American received kickbacks, American chose "to use the kickbacks to produce and mail….more than 100,000 American Bank solicitations to borrowers in virtually every state[.]"  *Id.* ¶ 56; *see, e.g.*, ECF 1-6 (Example of an American Bank solicitation).

"At least some of the" the solicitations to borrowers represent that All Star was American's "Preferred Title Company" and borrowers would "Save 30-40% off title fees with All Star Title!"  ECF 1-6 (American Bank Solicitation); ECF 1, ¶ 57.  Plaintiffs allege that this representation in American's solicitations was "fraudulent and false because American Bank did

not recognize any designation of 'preferred title company' and had not conferred any designation on All Star[.]"  ECF 1, ¶ 58.  Moreover, plaintiffs claim that this representation was "fraudulent" because American "was recommending All Star for the purpose of obtaining a kickback and in furtherance of the concealed kickback and referral agreement[.]"  *Id.* ¶ 60. Further, plaintiffs contend that the representation that borrowers would save 30-40% by using All Star was also "false because the prices American Bank and All Star charged borrowers were not discounted or lower by any percent." *Id.* ¶¶ 27, 59.

According to plaintiffs, a series of emails demonstrates that All Star and American "conspire[d] and agree[d] to fix the prices charged borrowers assigned and referred from the American Bank Nottingham Branch at $1,500...."  ECF 1, ¶ 62.  On January 7, 2009, Scott Smith, a loan officer at the Nottingham Branch, emailed Horwitz: "Aimee... was interested in sending you some deals/loans. Can you give her the same deal ($1500 per loan)[?]" ECF 1-7. Horwitz responded shortly thereafter: "Thanks buddy, yeah absolutely same deal!" *Id.*  And, on February 11, 2009, Horwitz sent a clarifying email to Courtney Smith, another loan officer at the Nottingham Branch, explaining that "for [American Bank] we're doing $1500 on streamlines. That includes everything (title insurance & recording)[.] Obviously states that have higher recording is an exception. On non streamlines you can charge $1500 plus title insurance[.]" ECF 1-8.

Plaintiffs allege that "[t]hese charges [were] at least $100 higher than All Star [was] charging on loans assigned and referred from other lenders participating in the All Star Scheme and represents the American Bank Overcharge" that was "charged for the sole purpose of funding the kickbacks."  ECF 1, ¶ 63.  Plaintiff points to an email between Horwitz and Christine Zimmerman "relating to fixed prices with Chesapeake Mortgage Funding" as evidence that the

American charges were $100 higher than charges from other lenders.  *Id.*  In the email, Horwitz clarified: "i think for streamlines [for Chesapeake Mortgage Funding] we're doing a flat $1400 inc title ins and recording.  other loans will be 1250 plus title ins[.]"  ECF 1-9.

According to plaintiffs, All Star and American Bank continually raised the fixed prices charged to the borrowers referred to All Star from the Nottingham Branch.  In April 2009, for example, American Bank and All Star "raise[d] the fixed prices charged borrowers on loans assigned and referred" from Ray Notaro, a loan officer at the Nottingham Branch, to $2,000. ECF 1, ¶ 64; *see* ECF 1-10 (Emails between Notaro and Horwitz, April 2009).  Then, in May 2010, American Bank and All Star raised the fixed prices on all the loans assigned and referred from the Nottingham Branch to $1,750.  ECF 1 at 21, ¶ 68; ECF 1-13 (Emails between American Bank loan officers and Horwitz, May 24, 2010).  And, in March 2011, American and All Star again raised the fixed prices to $2,250.  ECF 1 at 22, ¶ 71; ECF 1-15 (Emails between Brian Batterden, Nottingham branch manager, and Horwitz, March 15, 2011).

Plaintiffs contend that these charges were "between $175 to $1,050 higher than All Star [was] charging borrowers assigned and referred by other lenders" participating in the scheme. ECF 1 at 22, ¶ 71; *see also id.* at 19-21, ¶¶ 65, 69. And, according to plaintiff, the charges "include a minimum $500 Kickback Overcharge, charged for the sole purpose of paying for the kickbacks and not associated with any legitimate title or settlement service." *Id.*; *id.* at 22, ¶ 73. And, plaintiffs posit that the marketing fee and the settlement overcharges are "the minimum amount of actual damages incurred by the American Bank borrowers" from the scheme between All Star and American Bank. *Id.* at 19-22, ¶¶ 63, 65, 69, 73.

In fact, in May 2011, the Veterans Administration ("VA") alerted American Bank that its prices "violated the requirement that the fees charged are reasonable and customary."  ECF 1 at

22, ¶ 74.  In an email of May 13, 2011, Mary Carter, a loan closer at American Bank, wrote, ECF 1-17 at 3: "The above loans were recently audited by VA. VA is stating that based on comparison averages for loans which have closed in these states, the total title costs charged to the veteran[s] are ABOVE what would be considered 'reasonable and customary' title search/abstract and title insurance fees for these areas."

Plaintiffs assert that it was clear "from the beginning that All Star was paying the kickbacks in exchange for the referral of loans and American Bank's loan officers underst[oo]d the payment [was] for the referral of loans[.]"  ECF 1 at 19, ¶ 66.  In an email of April 22, 2009, for example, Notaro sent an email to Horwitz, confirming their business arrangement: "Just wanted to forward you a copy of the mailer that is going out. All 2500 are being sent to NC… I attached the invoice as well….the payment is due by 10 am tomorrow…. I appreciate your confidence in my ability and do trust that all loans are coming your way!" ECF 1-11.  In his response to Notaro the next day, Horwitz said: "[S]ent everything to Richard at Red Clay, we should be all set!"  *Id.*

Plaintiffs also claim that "[t]hroughout this time period, American Bank and All Star acknowledge[d] that the kickbacks [were] being paid in exchange for the referral of American Bank loans[.]"  ECF 1 at 20, ¶ 70.  In an email on February 25, 2011, Brian Batterden, branch manager for Nottingham Branch, wrote to Horwitz: "I completely understand if you don't want to pay for the mail. This will pick up in the next few weeks…. You should be able to get about 15-20 deals a month from here starting now so that should be how to base your decision." ECF 1-14.

According to plaintiffs, "[a]s the word of the kickbacks spread, American Bank loan officers clamor[ed] to take advantage of the Kickback Agreement" with All Star.  ECF 1 at 20, ¶

67.  For instance, on November 5, 2009, James Ventura, a loan officer at the Nottingham Branch, wrote to Horwitz, seeking "New Business."  ECF 1-12.  Ventura said: "All-Star was one of the names that came up when we were discussing who I should use for my title…. If you would be willing to do mail for me, I can send you a number of deals today and everything I get moving forward.  Let me know if you are interested and I'll talk to you soon."  *Id.*  Horwitz responded to Ventura on the same day: "We would love to get your business and would be more than happy to do your pre-signings and make some mail arrangements. If you want to have your mail company send over the invoice and I'll take care of it ASAP."  *Id.*

"Based on American Bank's and All Star's continuing pattern of practice," plaintiffs allege that American Bank "participate[d] in the All Star Scheme" with additional "American Bank branches, branch manager and loan officers," including American Bank branches located in Greenbelt, Lutherville, Columbia, and Rockville.  ECF 1 at 23, ¶ 76.  Lendanear Data & Direct Mail Services, "a Tennessee based leads and mail marketing company," for example, shipped mailers to Christian Dale at an American Branch in Rockville and invoiced Horwitz for $1,300 on August 19, 2010.  ECF 1-18; ECF 1 at 24, ¶ 77.

Further, plaintiffs aver that other third-party marketing companies were used to launder the kickbacks. ECF 1 at 24, ¶ 77.  And, plaintiffs posit, *id.* at 25, ¶ 81 :

> No good, [sic] facilities, or services [were] provided by any of the American Bank employees and/or agents, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by American Bank of the kickbacks [were] made expressly and solely for the assignment and referral by American Bank of American Bank borrowers.

According to plaintiffs, as a result of American's participation in the All Star scheme, American Bank borrowers, including Ekstrom and Carnahan, were

> harmed because they [were]: (a) defrauded into being charged and paying amounts that [were] not related to any legitimate title and settlement services (b)

charged and pa[id] higher and unnecessarily increased amounts for title and settlement services that they would have without the Kickback Agreement, fixed prices, and the pattern of racketeering activity conducted in furtherance of the All Star Scheme; (c) denied kickback free title and settlement services; and (d) [were] denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

ECF 1 at 24, ¶ 78,

## C. American Bank's Alleged Fraudulent Concealment

Plaintiffs assert that "American Bank and All Star under[took] affirmative acts that fraudulently conceal[ed]" the kickback scheme. *Id.* at 30, ¶ 81. According to plaintiffs, American and All Star used third-party marketing companies and sham invoices issued by the marketing companies to conceal the kickbacks. *Id.* at 30, ¶¶ 82, 83; *see* ECF 1-20 (collection of invoices paid by All Star to third-party marketing companies in 2009 and 2010). These invoices and resulting payment records created a "false record" that "conceal[ed] the kickbacks, Kickback Agreement and All Star Scheme from any person…including auditors, regulators, law enforcement or borrowers." ECF 1 at 31, ¶¶ 84, 85.

In addition, plaintiffs claim, ECF 1 at 32, ¶ 88:

As a regular and continuing business practice, American Bank and All Star allocate[d] the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR [Annual Percentage Rate], thereby falsely minimizing the APR reported on American Bank borrowers' loan documents and required federal disclosures.

The Truth in Lending Act ("TILA") requires lenders to report the Annual Percentage Rate ("APR") associated with a loan. *Id.* at 31, ¶ 86.[2] Among other things, plaintiffs note that "fees for title examination, abstract of title, [and] title insurance" are supposed to be excluded from the APR calculation. *Id.* ¶ 89. But, settlement and closing fees and application signing fees

---

[2] The APR is "is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 1026.22(a)(1).

"are settlement service costs required to be included in the APR calculation." *Id.* Plaintiffs contend that American Bank and All Star "allocate[ed] the charges associated [with] conducting a settlement or closing with a borrower to the category of 'title exam' or 'abstract,'" and thereby created a "false, and falsely minimized, APR." *Id.* According to plaintiffs, this means that "All Star and American Bank allocate[d] all charges, including that portion attributable to conducting a settlement or closing, to 'Title Exam' or 'Abstract,' which are excluded from the APR." ECF 1, ¶ 92; *see also* ECF 1-19 (Carnahan HUD-1, December 9, 2010).

Plaintiffs point to a series of emails that allegedly show All Star's practice of manipulating the APR "as a regular business practice." ECF 1, ¶ 90; *see* ECF 1-21; ECF 1-22; ECF 1-23. Further, plaintiffs assert that American Bank "participate[d] in and ratif[ied] this false allocation of fees…. throughout the time period American Bank [was] participating in the All Star scheme." ECF 1, ¶ 91; *see also* ECF 1-24 (Emails between Rachel Bridges, American Bank loan officer, and Heather Reid, All Star loan processor, October 14, 2011); ECF 1-25 (Emails between Brian Caldwell, American Bank loan officer, and Renay Brown, All Star loan processer, October 21, 2010). And, plaintiffs allege that All Star used various software programs, including one called "Titlehound," to make "these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce American Bank loan documents to present to borrowers and on which American Bank, and All Star intend borrowers rely." ECF 1, ¶ 95. This false allocation of fees, according to plaintiffs, "fraudulently concealed from American Bank borrowers the coordinated business relationships between All Star and American Bank. . ." *Id.* ¶ 96.

Moreover, plaintiffs maintain that American also made false representations to borrowers in the "Good Faith" estimate forms. *Id.* ¶¶ 100, 103.[3]  According to plaintiffs, American Bank fraudulently included "the American Bank and Kickback Overcharges" associated with the scheme in disclosures to borrowers meant to reflect the charges for "'title services and lender's title insurance.'"  *Id.* ¶ 100; *see* ECF 1-19 at 3.  This practice, according to plaintiffs, concealed from borrowers "the illegal kickback;" "the fact and amount of" overcharges; "the coordinated business relationship between American Bank and All Star;" "the agreement fixing prices;" and, "the pattern of racketeering activity All Star performs with American Bank." ECF 1, ¶ 101.

Further, plaintiffs posit that American and All Star made false representations on borrowers' HUD-1 settlement statements.[4]  In particular, plaintiffs contend that "American Bank and All Star. . . cause[d] the false allocation of fees. . . to repeat and appear on American Bank borrowers' HUD-1 statements…." and omitted "the amount of the kickback received by American Bank…" *Id.* ¶¶ 107-108.  Similarly, plaintiffs claim that the amount of the overcharge "or other flat fee" associated with the scheme did not appear on borrowers' HUD-1 forms.  *Id.* ¶ 109.

Finally, plaintiffs claim that American was obligated to disclose the charges resulting from the scheme on a "Direct Endorsement" form that is required for Federal Housing Administration ("FHA") or VA loans.  *Id.* ¶¶ 111, 112 (citing 24 C.F.R. §§ 203.27, 203.255).  However, according to plaintiffs, "American Bank falsely certified borrowers Direct Endorsement" because "the fees charged borrowers did not comply with HUD regulations

---

[3] American Bank, as a lender, was obligated to provide a "Good Faith Estimate" form to the borrower.  ECF 1, ¶ 98; 12 C.F.R. App'x C to Part 1024.

[4] The HUD-1 settlement statement is a standard form indicating fees charged to a borrower by a mortgage lender or broker.

because the charges" were "not reasonable and customary" and were inflated due to the kickback scheme.  ECF 1, ¶ 113.

### D.  Timothy Ekstrom

Ekstrom's mortgage from American Bank closed on December 9, 2010.  ECF 1 at 26, ¶ 67.  Courtney Judge, a loan officer at the Nottingham Branch, referred Ekstrom's mortgage to All Star.  *Id.* at 27, ¶ 68.  Plaintiffs contend that this referral was "quid pro quo for the kickbacks All Star paid American Bank in November, 2010."  *Id.*  As a result, according to plaintiffs, Ekstrom was deprived "of his choice of title and settlement service provider and . . . kickback-free title and settlement services."  *Id.*

Further, plaintiffs contend that All Star charged Ekstrom "$1,750 in total title and settlement service fees," which was "higher than the same charges would have been," absent the kickbacks.  *Id.* at 27, ¶ 69.  In particular, plaintiffs maintain that the "title and settlement service fees include[d] the $600 American Bank Overcharge and $500 Kickback Overcharge…which is the minimum amount of Ekstrom's actual damages…."  *Id.* at 27, ¶ 70.

According to plaintiffs, Ekstrom had "no actual notice before, at or after the closing of [his] American Bank loan[] of the illegal kickbacks," the relationship between American Bank and All Star, the scheme generally, or the resulting overcharges.  *Id.* ¶ 115.  Ekstrom reviewed his loan documents in advance of the closing, but they reflected the "false allocation of fees" as well as a "false APR."  *Id.* ¶ 120.  Ekstrom believed the representations made in these documents because he had "no reason to believe" that there was "a coordinated business relationship. . . between American Bank and All Star" or a kickback scheme.  *Id.*

Plaintiffs contend that American Bank and All Star also omitted from the documents provided to Ekstrom at his closing, including his HUD-1, "any description or statement" of a

coordinated business relationship between American Bank and All Star and "any description or statement of any payment. . . by All Star to American Bank…related to Plaintiff Ekstrom's loan." *Id.* ¶¶ 125, 126.

On or about June 10, 2019, Ekstrom was contacted by counsel concerning his loan. *Id.* ¶ 131. This was his "first indication of any potential wrongful" conduct. *Id.* He retained counsel within days, and the Complaint was filed within a year of Ekstrom "becoming aware of facts giving rise to his causes of action, injuries, and actual damages." *Id.* ¶ 132.

### E.  Davida Carnahan

Davida Carnahan obtained a residential mortgage loan from American Bank on or about December 9, 2010. *Id.* at 28, ¶ 74; *see* ECF 1-19. Amy Smith, a loan officer at the Nottingham Branch, referred Carnahan's mortgage to All Star as a "quid pro quo for the kickbacks All Star paid American Bank in November 2010." *Id.* at 28-29, ¶¶ 74, 75. Carnahan was charged $1,750 in title and settlement fees, which allegedly included "$600 in American Bank Overcharge and $500 Kickback Overcharge." *Id.* at 29, ¶ 76; ECF 1-19.

Plaintiffs contend that Carnahan "receive[d] loan documents prepared by American Bank in advance of [her] closing and review[ed] those loan documents." *Id.* ¶ 133. Carnahan avers that the loan documents omitted any description of the coordinated business relationship between American Bank and All Star, the payment of kickbacks, and the "fixed nature of charges" for title and settlement services. *Id.* ¶¶ 135, 138. And, the documents contained the "false allocation of fees and a false APR. . . ." *Id.* ¶ 136.

At the loan closing, Carnahan was provided with a HUD-1 settlement statement that did not contain any statements concerning the coordinated business relationship between American

Bank and All Star or the kickback payments. *Id.* ¶¶ 140-142. And, the HUD-1 contained a "false allocation of fees." *Id.* ¶ 143; ECF 1-19.

According to plaintiffs, Carnahan was first informed of the potential wrongdoing on June 10, 2019. *Id.* ¶ 147. She retained counsel "within days" and the Complaint was filed "within a year." *Id.* ¶ 148.

Additional facts are included, *infra*.

## II. Legal Standards

### A. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019)

(alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is

21

proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, plaintiffs included 24 exhibits with the Complaint. ECF 1-2 to ECF 1-25. All of the documents are specifically referenced in the Complaint. Accordingly, in ruling on the Motion, I may consider the exhibits without converting the Motion to one for summary judgment.

The Motion is supported by one exhibit: the "New RESPA Rule FAQs." ECF 14-2. Because the FAQ is publicly available and its authenticity is not contested, I may also consider it in resolving the Motion.

### B. Rule 9(b)

Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Claims that sound in fraud,

whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Rule 9(b).  *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Under the rule, a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted); *see Fessler v. Int'l Business Machines Corp.*, 959 F.3d 146 (4th Cir. 2020).  In other words, Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how of the alleged fraud" before the parties can proceed to discovery.  *United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted)

> Rule 9(b) serves several salutary purposes:
>
> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular

circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

## III.  Discussion

Plaintiffs allege that American's kickback scheme with All Star violated RESPA, 12 U.S.C. § 2601 (Count I), and RICO, 18 U.S.C. § 1962 (Count II).

Defendant moves to dismiss both counts.  First, defendant argues that plaintiffs' RESPA claim is time-barred because the alleged violations occurred in 2010 and plaintiffs have not set forth facts sufficient to toll the statute of limitations.  ECF 14-1 at 7-18. Moreover, defendant asserts four grounds to support dismissal of the RICO claim.  In particular, defendant posits: (1) the RICO claim is time-barred; (2) plaintiffs have not alleged a RICO enterprise; (3) plaintiffs did not allege any specific instances of mail or wire fraud, as required to establish a pattern of racketeering; and (4) plaintiffs failed to allege a proximate injury.  ECF 14-1 at 18-30.

### A.  RESPA

As noted, defendant contends that plaintiffs' RESPA claim is time-barred.  ECF 14-1 at 7-11. It notes that a claim for a violation of 12 U.S.C. § 2607(a) "must be brought within '1 year…from the date of the occurrence of the violation[.]'"  *Id.* at 7 (quoting 12 U.S.C. § 2614).

And, it asserts that plaintiffs have not pleaded facts adequate to entitle them to equitable tolling of limitations.  ECF 14-1 at 11-18.

Under RESPA, a claim must be lodged within one year of the loan closing.  12 U.S.C. § 2614.  But, the doctrine of equitable tolling is available in RESPA cases.  Because the loans for both plaintiffs closed in 2010, they must allege facts sufficient to meet the test for equitable tolling.  As the court said in *Walls v. Sierra Pacific Mortgage Company, Inc.*, GLR-19-595, 2020 WL 1528626, at *3 (D. Md. Mar. 31, 2010):

> RESPA claims must be filed one year from the closing of the loan. 12 U.S.C. § 2614; *see also Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 546 (4th Cir. 2019). However, the statute of limitations is subject to tolling on equitable grounds— including fraudulent concealment. *Id.* at 548. The fraudulent concealment doctrine prevents defendants from taking advantage of the limitations period when they have committed "secret illegal conduct." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 125 (4th Cir. 1995).

The test for equitable tolling was articulated by the Fourth Circuit in *Marlinton*, 71 F.3d at 122.  There, the Court said, *id.*:

> To invoke the doctrine in this circuit, a plaintiff in an antitrust action must satisfy each element of a three part test. Specifically, a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.

More recently, in *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535 (4th Cir. 2019), the Fourth Circuit made clear that the doctrine of equitable tolling may provide relief from RESPA's limitations period based on fraudulent concealment, if the Court's three-step test is satisfied.  *Id.* at 549.  The "affirmative" acts of concealment necessary to establish fraudulent concealment "may include acts of concealment involved in the [alleged] violation itself."  *Id.* at 553 (alteration in original).  Thus, "[a] plaintiff satisfies its burden to allege an affirmative act of concealment if, for example, it alleges that the defendant employed 'some trick or contrivance

intended to exclude suspicion and prevent inquiry.'" *Id.* (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446-47 (6th Cir. 2012)).

In *Edmonson*, a group of mortgage brokers had entered into agreements with a title services company to refer loans for title and settlement services in exchange for "unearned fees and kickbacks to induce those referrals. . . in violation of RESPA. . . ." 922 F.3d at 541. The alleged kickbacks were made to corporations created by a marketing and account representative of the title services company for the purpose of providing marketing and lead-generation services. *Id.* The Fourth Circuit concluded that the plaintiffs' allegations that the kickbacks had been laundered through the sham companies, that the defendants had entered into "sham" backdated title services agreements,  and that the mortgage lenders had "concealed their kickback scheme by not reporting the payments on Plaintiffs' required HUD-1 Settlement Statements. . .", constituted affirmative acts of concealment sufficient to trigger equitable tolling and to survive a motion to dismiss. *Id.* at 553-54.

As an initial matter, defendant asserts that plaintiffs cannot rely on fraudulent concealment because the plaintiffs have known about the allegedly excessive price for All Star's settlement services since December 2010. ECF 14-1 at 7-11. And, the excessive price is plaintiffs' "only actual injury." *Id.* at 11. Moreover, defendant claims that the relevant precedent—*Edmonson*—and this Court's decision in *Donaldson v. Primary Residential Mortg., Inc.,* ELH-19-1175, 2020 WL 3184089 (D. Md. June 12, 2020), are consistent with its argument because neither case "considers how the plaintiffs' conceded knowledge of the inflated price affects the availability of fraudulent concealment tolling." ECF 18 at 4. In response, plaintiffs argue that defendant mischaracterizes plaintiffs' claimed injury; plaintiffs' injury is the fraudulent and illegal kickback charges, not "merely excessive charges." ECF 17 at 5-9.

As plaintiffs posit, defendant's argument misrepresents plaintiffs' alleged injury. And, the cases on which defendant relies are readily distinguishable from the facts of this case. For example, in both *Orsi v. Kirkwood,* 999 F.2d 86 (4th Cir. 1993), and *Davis v. Beazer Homes, U.S.A. Inc.*, No. 1:08CV247, 2009 WL 3855935 (M.D.N.C. Nov. 17, 2009), the plaintiffs alleged that the defendants had concealed the true value of the property they were purchasing, so they were entitled to fraudulent concealment tolling. 999 F.2d at 89; 2009 WL 3855935, at *4-5. Unlike in *Orsi* and *Davis*, in this case plaintiffs allege that American concealed an entire kickback scheme, including the "coordinated business relationships," the "agreement fixing prices," and the "pattern of racketeering activity," not just an inflated price. *See, e.g.*, ECF 1 at 31, ¶ 85; *id.* at 34, ¶ 96. Therefore, the holdings in those cases are inapposite.

In addition, neither the *Edmonson* nor *Donaldson* Courts considered how plaintiffs' knowledge of the inflated price affected the availability of fraudulent concealment tolling because that would mischaracterize the injury and the relevant inquiry. Rather, the question for the Court is whether American Bank concealed the facts of the allegedly fraudulent scheme, not just the excessive price that resulted from the scheme.

Plaintiffs maintain that they have adequately pleaded affirmative acts of concealment on the part of American Bank. ECF 17 at 11-12. In particular, plaintiffs contend that All Star and American laundered money through third-party marketing companies and used "sham invoices" to conceal the "kickbacks" paid by All Star in exchange for referrals from American Bank. *See, e.g.,* ECF 1, ¶¶ 7, 34. And, plaintiffs allege that American engaged in falsification of various disclosures to lenders, including the APR, the "Good Faith Estimate," and plaintiffs' HUD-1 settlement statements. *Id.* at 31-38.

Defendant argues that mere nondisclosure of information does not establish fraudulent concealment because American had no legal duty to disclose the alleged kickbacks in any of the loan-related documents.  ECF 14-1 at 13-18; ECF 18 at 9-16.  In particular, Congressional argues that no concealment occurred with respect to the plaintiffs' HUD-1 forms, for instance, because the forms accurately stated the charges that the plaintiffs paid for title related settlement services.  ECF 14-1 at 16-17; ECF 18 at 11. And, American had no additional disclosure requirements.  *Id.*

However, the Third Circuit explicitly rejected this argument in *In re Comm. Bank. of N. Va. Mortg. Lending Practices Lit.*, 795 F.3d 380 (3d Cir. 2015).  There, the court explained, *id.* at 403:

> Even assuming that a HUD-1 correctly summarizes the fees and charges actually paid by a borrower for settlement services in connection with a federally related mortgage loan, it does not follow that the HUD-1 should be viewed in isolation. Federal regulations associated with that form control the nature and quality of information that is supposed to be included in each HUD-1, and borrowers should be able to rely on that information in fact being of the requisite nature and quality….We therefore conclude that inclusion of misleading information in a HUD-1 can constitute an independent act of concealment.

*See also Edmonson*, 922 F.3d at 554 ("[O]mitting required information from the HUD-1 Settlement Statement form can constitute an affirmative act of concealment for the purposes of the fraudulent concealment tolling doctrine."); *Fangman v. Genuine Title, LLC*, RDB-14-0081, 2016 WL 6600509, at *6 (D. Md. Nov. 8, 2016) (finding fraudulent concealment where HUD-1 statements omitted any evidence of kickback arrangement even if statement accurately stated the charges that plaintiffs had paid).

*Somerville v. West Town Bank & Trust*, PJM-19-0490, 2019 WL 6131288 (D. Md. Nov. 19, 2019) is instructive here.  In that case, which also involved allegations of kickbacks paid by All Star through a third-party company, Judge Messitte observed that such payments "are in-of-themselves evidence of the type of trickery that amounts to fraudulent concealment."  *Id.* at *2.

And, the court determined that a plaintiff sufficiently alleges fraudulent concealment when a defendant conceals kickbacks by failing to report the "payments that it received from All Star on the HUD-1 Settlement Statements and other settlement documents, including the Good Faith Estimate." *Id.* (citing *Edmonson*, 922 F.3d at 554).

Similarly, in *Walls*, 2020 WL 1528626, Judge Russell concluded that the plaintiffs had "sufficiently pled that [the mortgage lender] fraudulently concealed evidence of its alleged scheme," based on factual averments akin to those presented here, including alleged kickback payments through third party marketing companies, and the use of falsified loan documents. *Id.* at *5; *see also Kadow v. First Federal Bank*, PWG-19-0566, 2020 WL 5230560, at *5 (D. Md. Sept. 2, 2020) (finding plaintiffs met their burden to allege fraudulent concealment by alleging defendant used third party marketing companies and sham invoices, and failed to report the payments on plaintiffs' HUD-1 statements).[5]

Therefore, I conclude that plaintiffs have pleaded sufficient allegations to show acts of concealment and, in turn, to set forth a basis for equitable tolling.

As to plaintiffs' diligence, defendant does not make any contentions beyond its initial argument that plaintiffs knew of the alleged excessive prices, so they were always on notice of their purported claims. ECF 14-1 at 7-11. Plaintiffs contend that they have specifically alleged the reasonable diligence of both Ekstrom and Carnahan. ECF 17 at 11-12.

Notably, a cause of action accrues when the plaintiff "has actual or constructive knowledge of his or her claim." *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020). Under the so-called discovery rule, accrual cannot occur until the plaintiff has, or should have, "possession of the critical facts that he has been hurt and who has inflicted the

---

[5] As noted, the plaintiffs in *Walls*, *Somerville*, and *Kadow* are represented by the same lawyers who represent the plaintiffs in this case.

injury." *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *see also*, *e.g.*, *Nassim v. Md. House of Corr.*, 64 F.3d 951 (4th Cir. 1995) (en banc); *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010), *aff'd*, 495 F. App'x 350 (4th Cir. 2012).

In addressing the diligence element, the *Somerville* Court noted that "it is not for the Court to determine at this stage that. . . 'one would expect a reasonable residential mortgage borrower' to conduct a further investigation into its lender's documents and fee structures." *Somerville*, 2019 WL 6131288, at *3 (quoting *Edmonson*, 922 F.3d at 558). Similarly, the *Walls* Court concluded that plaintiffs there "had no reason to investigate a potentially fraudulent relationship between [defendant] and All Star." *Walls*, 2020 WL 1528626, at *5; *see also Kadow*, 2020 WL 5230560 at *6.

Applying the same logic here, I cannot conclude, as a matter of fact or law, that plaintiffs failed to exercise due diligence. Accordingly, at this juncture defendant is not entitled to dismissal of the suit based on limitations.

## B. RICO

Congressional argues that plaintiffs have not adequately asserted a RICO claim. ECF 14-1 at 20-30. In addition to being time-barred, defendant contends that the plaintiffs have failed to plead allegations in support of the existence of a RICO enterprise or a pattern of racketeering activity. *Id.*[6] And, defendant asserts a lack of proximate cause. *Id.* at 28.[7] In response,

---

[6] Because defendant's limitations argument is identical to its limitations argument under RESPA, the Court need not address it again.

[7] Defendant also maintains that plaintiffs have failed adequately to allege an injury caused by the use of racketeering income. ECF 14-1 at 28. But, it acknowledges that it is bound by the Fourth Circuit's decision in *Busby v. Crown Supply*, 896 F.2d 833 (4th Cir. 1990). *See* ECF 14-1 at 28.

plaintiffs claim that the Complaint adequately alleges the elements of an association-in-fact enterprise and a pattern of racketeering activity. *Id.* at 17-18, 21-22.

Congress enacted the Racketeer Influenced and Corrupt Organizations law as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922 (1970), 18 U.S.C. §§ 1961-1968. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated with any enterprise to conduct or participate in the "enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

RICO is not limited to criminal cases. In addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g.*, *Lewis v. Maryland*, PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014). But, the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

To plead a civil RICO claim, the plaintiff must allege "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); *see Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238

(4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012).

A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs, and attorney's fees. *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005). The Supreme Court has characterized RICO's civil penalties as "'drastic.'" *Awappa*, 615 F.3d at 317 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989)); *see* 18 U.S.C. § 1964(c)).

Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989). And, courts have recognized the "need to limit [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238. It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*).

In other words, RICO "'is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009). It applies to "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Menasco, Inc.*, 886 F.2d at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See, e.g.*, *Boyle*, 556 U.S. at 944; *Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015). In *Mitchell Tracey*, 935 F. Supp. 2d at 842, the court explained:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985).

Because "'an enterprise includes any union or group of individuals associated in fact,'" RICO extends to "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). And, a RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948; *see United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) (stating that a RICO enterprise "need not have a rigid structure…."). However, "'[v]ague allegations of a RICO

enterprise . . . lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracy*, 935 F. Supp. 2d at 843 (citation omitted; modifications in *Mitchell Tracy*).

Notably, "an association-in-fact enterprise must have at least three structural features." *Boyle*, 556 U.S. at 946. These include "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*; *accord Pinson*, 860 F.3d at 161.

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, among many other crimes. As indicated, however, "RICO is not 'aimed at the isolated offender.'" *Zepkin*, 812 F.2d at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "[W]hile two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496 n.14. To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added). Judge Chasanow has reiterated: "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a

threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, 482 U.S. at 239).

Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). And, the enterprise's actions must affect interstate commerce. *Sterling v. Ourisman Chevrolet of Bowie, Inc.* 943 F. Supp. 2d 577, 587-88 (D. Md. 2013).

As indicated, a pattern of racketeering activity involves *continued* criminal activity. *H.J. Inc.*, 492 U.S. at 239. The Fourth Circuit has adopted a "flexible" approach to the "continuity" requirement. *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1989), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). Courts utilize a "case-by-case analysis, *Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at *6 (D. Md. Aug. 20, 2018), and consider "the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (citation omitted); *see Zepkin*, 812 F.2d at 155 ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that continuity depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur").

"'Continuity' is both a closed – and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. The Fourth Circuit explained in *Menasco*, 886 F.2d at 683-84:

> Continuity . . . refers to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*. To satisfy the

continuity element, a plaintiff must show that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity. Significantly, [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Thus, predicate acts must be part of a prolonged criminal endeavor.

(Internal quotation marks, citations, and parentheticals omitted; alteration and emphasis in original).

As to continuity, "[f]acts relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185.

Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies. *See, e.g.*, *Lewis*, 2018 WL 1425977, at *5 (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-3688, 2017 WL 281997, at *6 (D. Md. Jan. 23, 2017) (same); *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mr. 29, 2016) (applying Fed. R. Civ. P. 9(b) to RICO claim based on mail or wire fraud), *aff'd*, 671 F. App'x 127 (4th Cir. 2016); *Bailey*, 992 F. Supp. 2d at 584 ("A plaintiff must plead circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b).") (citations and quotation marks omitted); *Sriram*, 984 F. Supp. 2d at 505.

### 1. Enterprise

Defendant argues that plaintiffs have not adequately alleged the existence of a RICO enterprise. ECF 14-1 at 20-24. Congressional posits that plaintiffs have alleged a "rimless wheel conspiracy," by which "'defendants enter into separate agreements with a common

defendant, but . . . the defendants have no connection with one another[.]'" *Id.* at 21 (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) (internal citations omitted)).  And, defendant asserts that this Court's ruling in *Donaldson*, 2020 WL 3184089, is dispositive here because the facts of both cases are "functionally identical."   ECF 14-1 at 22-23.   In response, plaintiffs maintain that their allegations can be distinguished from those in *Donaldson* because in this case, they "have expressly alleged only a bilateral association in fact enterprise between American Bank and All Star."  ECF 17 at 15.

In *Donaldson*, which also involved allegations of kickbacks paid by All Star through a third-party company, I concluded that plaintiffs failed plausibly to allege a RICO enterprise. 2020 WL 3184089, at *25-26. The Complaint identified the participants of the scheme as All Star, the defendant bank, and other "Participating Lenders," which, as I noted, was of a hub and spoke variety.  *Id.* at *26.  But, I found that the allegations failed to allege facts connecting the spokes to each other, so as to constitute an enterprise.  *Id.*  Moreover, even though plaintiffs argued that they could limit their RICO claim to that of a bilateral enterprise, I concluded that this would require rewriting the Complaint.  *Id.*; *see also Kadow*, 2020 WL 5230560, at *10 ("Plaintiffs seeks to have it both ways, writing nearly 300 paragraphs about how CBC National and other Participating Lenders participated in the 'All Star scheme' but then ask the Court to find that the alleged agreement between CBC National and All Star on its own constitutes a RICO conspiracy.").  Therefore, I dismissed plaintiffs' RICO claim.  *Donaldson*, 2020 WL 3184089, at *25-26; *Kadow*, 2020 WL 5230560, at *10 ("[I]f all of the Participating Lenders are involved, the RICO claim fails as a rimless hub and spoke conspiracy.").

In contrast to the complaints in both *Donaldson* and *Kadow*, the Complaint in this case alleges a bilateral enterprise.  Plaintiffs assert: "For a continuous period of at least eighteen

months, American Bank and All Star associate and commit the predicate acts pled herein…for the common purpose of defrauding borrowers into paying higher and fixed prices for title and settlement services." ECF 1, ¶ 175. Accepting all allegations in the Complaint as true, the question is whether the bilateral enterprise that plaintiffs allege constitutes an "association-in-fact" enterprise for the purpose of asserting a RICO claim.

As indicated, under RICO "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Further, the group must engage in a course of conduct for a common purpose and on behalf of the enterprise, as opposed to "'their individual capacities, to advance their individual self-interests.'" *Peters v. Aetna, Inc.*, 15-cv-0109-MR, 2016 WL 4547151, at *1 (W.D.N.C. Aug. 31, 2016) (quoting *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013)); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981).

Defendant maintains that even if plaintiffs allege a bilateral enterprise, it still would not constitute a RICO enterprise because plaintiffs fail to allege the existence of a common purpose. ECF 18 at 16-17. In response, plaintiffs assert that they have pled all of the elements of an "association-in-fact" enterprise, including that the enterprise shared a common purpose to "fix and impose higher and fraudulent charges on American Bank borrowers." ECF 17 at 17-18; *see* ECF 1, ¶ 175.

At this stage of the case, the Court is satisfied that plaintiffs have adequately alleged the association-in-fact enterprise. First, plaintiffs plainly allege that a bilateral enterprise existed and its members had a "common purpose": to "defraud[] borrowers into paying higher and fixed

prices for title and settlement services."  ECF 1, ¶¶ 175, 176.  *See Mitchell Tracey*, 935 F. Supp. 2d at 843-44 (finding an association-in-fact enterprise existed where its common purpose "was to charge borrowers inflated and illegal fees, to defraud members of the public and to give effect to the scheme described by a distinct division of labor").  Second, plaintiffs have adequately alleged that the individual members of the enterprise had relationships with each other and carried out specific roles in furtherance of the enterprise.  *See, e.g.*, ECF 1, ¶¶ 62, 64-72.  For example, plaintiffs attached numerous exhibits showing a relationship between Horwitz and various account executives at American.  *See, e.g.*, ECF 1-7; ECF 1-8; ECF 1-11; ECF 1-15.  Finally, the members of the enterprise were associated with each other for an extended period of time—at least 18 months, if not longer.  ECF 1, ¶ 175.

These allegations are sufficient to meet the test laid out by the Supreme Court in *Boyle*. *See Capital Lighting*, 2018 WL 3970469, at *12.  Accordingly, I conclude that plaintiffs have plausibly alleged the existence of a RICO enterprise.

### 2.  Racketeering Activity

#### a.  Predicate Acts

In support of their RICO claim, plaintiffs have alleged two predicate acts of racketeering activity: mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.  ECF 1, ¶ 177.

In order to show mail or wire fraud as a predicate act, a plaintiff must show (1) a scheme to defraud and, (2) use of the mails or wires in furtherance of the scheme.  18 U.S.C. §§ 1341, 1342; *Chisolm v. TranSouth Fin. Corp.*, 95 F. 3d 331, 336 (4th Cir. 1996).  In addition, when mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity under Rule 9(b).  *Menasco*, 886 F.2d at 684.  This means the Complaint must allege

the "time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." *Harrison*, 176 F. 3d at 784 (internal citation omitted). "However, '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which he will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Scott v. WFS Fin., Inc.*, No. 2:06cv349, 2007 WL 190237, at *5 (E.D. Va. Jan. 18, 2007) (quoting *Harrison*, 176 F. 3d at 784).

Further, "[w]hile a plaintiff normally must plead specific instances of mail or wire fraud, such a requirement is relaxed where there are 'numerous mailings of standardized documents containing identical false representations.'" *VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998) (quoting *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987)); *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 598 (D. Md. 2014). In these cases, "Rule 9(b) may be satisfied if the complaint sufficiently identifies '[t]he time period involved and the content of the misrepresentations.'" *VNA Plus*, 29 F. Supp. 2d at 1263 (quoting *Hurd v. Monsanto Co.*, 908 F. Supp. 604, 614 (S.D. Ind. 1995)). And, "[t]he mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but merely be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff relied to his detriment and may include mailings and wirings directed at nonparties." *Proctor*, 64 F. Supp. 2d at 473; *Day v. DB Capital Group, LLC,* DKC-10-1658, 2011 WL 887554, at *10 (D. Md. Mar. 11, 2011); *Schmuck v. United States*, 489 U.S. 705, 710 (1989); *In re Am. Honda Motor Co. Dealerships Litig.*, 941 F. Supp. 528, 546 n.19 (D. Md. 1996).

Congressional asserts that the "Complaint does not allege with particularity any instance of mail or wire fraud directed toward any particular individual." ECF 18 at 17; ECF 14-1 at 25. I disagree.

The Complaint alleges that there are "numerous mailings of identical false representations," the time frame during which they were sent, and the content contained in the solicitations. *VNA Plus*, 29 F. Supp. 2d at 1263; *see, e.g.*, ECF 1, ¶¶ 27, 56-60, 175. Further, plaintiffs have appended to the Complaint copies of the allegedly fraudulent solicitation mailers. *See* ECF 1-6. And, with respect to the wires, the Complaint alleges specific dates when American used wires to further its scheme and provided copies of invoices purportedly showing the funneling of kickback payments through third-party companies. ECF 1, ¶ 53; *see* ECF 1-20.

Accordingly, I conclude that plaintiffs have alleged, with particularity, that American engaged in a scheme to defraud borrowers and used the mail and wire services to further that scheme. *See Somerville*, 2019 WL 6131288, at *4; *Mitchell Tracey*, 935 F. Supp. 2d at 845 (finding sufficient allegations of mail and wire fraud where the complaint alleged "specific dates when [defendant] used the mail and electronic communication to further its scheme" and stated that distributions of the profits were sent interstate); *WW, LLC v. Coffee Beanery, Ltd.*, WMN-05-3360, 2012 WL 3728184, at *11 (D. Md. Aug. 27, 2012) (finding plaintiffs satisfied Rule 9(b) because they "outlined the alleged scheme to defraud, a time frame for the scheme, who was targeted by the scheme and the contents of the allegedly fraudulent communications that were sent using the mails and wires, and what Defendants hoped to obtain through the scheme.").

### b. Pattern of Racketeering

Defendant also argues that plaintiffs fail to satisfy the continuity requirement necessary to allege a pattern of racketeering. ECF 14-1 at 26-27; ECF 18 at 18. In particular, Congressional

41

asserts that "a single conspiracy between two parties for less than two years is not sufficient" to establish a RICO pattern.  ECF 18 at 18.

In response, plaintiffs claim that the Complaint points to at least four occasions in which American used "interstate wires to receive and accept illegal kickbacks."  ECF 17 at 21; *see* ECF 1, ¶ 53. And, plaintiffs contend that the Complaint identifies that "American sent more than 100,000 borrower solicitations in furtherance of the scheme to defraud on a[t] least 39 separate occasions over a period of more than sixteen months."  ECF 17 at 22; *see* ECF 1, ¶¶ 53, 56. Therefore, plaintiffs assert that they adequately alleged "a pattern of racketeering activity, constituting more than two acts within ten years."  *Id.* at 21.

As noted, to state a claim for a violation of RICO, a claimant must allege, *inter alia*, a "pattern of racketeering activity." 18 U.S.C. § 1962. The Supreme Court has outlined a two-part test, known as the "continuity plus relationship," to determine whether a "pattern of racketeering" exists: "a plaintiff…must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc.*, 429 U.S. at 239. Continuity requires either a "closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Closed-ended continuity, which appears to be at issue in this case, may be established "by proving a series of related predicates extending over a substantial period of time."  *Id.* at 242; *Walk v. Baltimore and Ohio R.R.*, 890 F.2d 688, 690 (4th Cir. 1989) ("What constitutes a 'substantial' duration must of course remain a matter for case-by-case determination.").

To determine whether a plaintiff has satisfied the continuity requirement, relevant factors to consider include "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the

potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185; *see also Friedler*, 2005 WL 465089, at *9 ("[D]etermining whether a pattern exists is a commonsensical, fact-specific inquiry, not a mechanical one determined solely by the number of predicate acts over a given period of time.").

The Fourth Circuit is "cautious about basing a RICO claim on predicate acts of mail and wire fraud because '[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'"   *Al-Abood*, 217 F.3d at 238 (quoting *Anderson v. Found. for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)) (internal quotation marks omitted) (alteration in *Anderson*).   "This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al-Abood*, 217 F.3d at 238; *but see Capital Lighting*, 2018 WL 3970469, at *8 (There is no "per se rule against a RICO claim involving only mail and wire fraud.") (*citing* Al-Abood, 217 F.3d at 238).

Nonetheless, I find that plaintiffs have alleged a fraudulent scheme that, if proven, would "pose a special threat to social well-being." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 (4th Cir. 2001) (quoting *Menasco*, 886 F.2d at 684)).

*Somerville*, 2019 WL 6131288, is again instructive. There, Judge Messitte found that the plaintiffs adequately pleaded a pattern of racketeering activity because they "alleged in detail a fraudulent scheme involving the conduct of multiple companies and at least six bank branches over the course of five years that…affected over 2,000 borrowers in multiple states." *Id.* at *6. He concluded that the defendant's purported acts were far-reaching enough to pose a "threat to societal trust in the country's banking and home-ownership systems" and thus were "appropriately covered by the RICO statute." *Id.*   Although the scheme in this case does not

43

extend quite as far, the allegations are similarly serious: plaintiffs allege a fraudulent scheme involving at least two companies and five bank branches over at least 18 months that allegedly affected over 800 borrowers' loans in 30 states.  ECF 1, ¶ 76, 175, 185.

Moreover, the facts in this case are readily distinguishable from cases where courts have found predicate acts of mail and wire fraud insufficient to satisfy the pattern requirement.  In *Menasco*, 866 F.2d 681, for example, the Court found that plaintiffs' allegations failed to satisfy the continuity prong of RICO's pattern requirement because defendants' actions were "narrowly directed towards a single fraudulent goal;" involved one perpetrator and one set of victims; and, the transaction took place in a period of one year.  *Id.* at 684.  Similarly, in *Friedler*, 2005 WL 465089, Judge Blake determined that the alleged predicate acts, consisting mainly of mail and wire fraud, failed to establish a RICO pattern because the scheme was driven by a single defendant and "narrowly targeted to misappropriate the plaintiffs' investments." *Id.* at *12; *see also Al-Abood*, 217 F.3d at 238 ("[T]he narrow focus of the scheme here—essentially a dispute between formerly close family friends—combined with the commonplace predicate acts persuades us that the facts here do not satisfy the pattern requirement."); *Zepkin*, 812 F.2d at 155 (distribution of a single misleading prospectus to ten investors did not constitute a RICO "pattern").

Unlike in both *Menasco* and *Friedler*, Ekstrom and Carnahan do not allege that the fraudulent scheme was narrowly targeted or only directed at them.  Instead, plaintiffs allege that American worked with All Star to defraud borrowers on more than 800 loans; thus, the actions potentially involved multiple perpetrators and many victims.  ECF 1, ¶ 168.  Moreover, the Complaint alleges that the predicate acts—the wire transfers and over 100,000 mail solicitations—spanned a period of at least eighteen months. ECF 1, ¶ 175; *see Venzor v.*

*Gonzalez*, 936 F. Supp. 445, 451 (N.D. Ill. 1996) (holding that a scheme over an 18-month period is sufficiently long to support closed-ended continuity). *But see Pinson*, 860 F.3d at 163 (finding a two and a half year period insufficient to satisfy continuity requirement where predicate acts were unrelated, isolated events); *GE Inv.*, 247 F.3d at 549 (finding that plaintiffs failed to satisfy continuity requirement where the purported conduct lasted only two years and "was designed for the single goal of allowing [the defendants] to profit from their interests [in the company]"); *McElhone*, 841 F.2d at 538 (holding fraudulent acts lasting seven years by single entity against single victim did not establish racketeering pattern).

In fact, in both *Menasco* and *Friedler*, the courts noted that plaintiffs' claims may have succeeded if they had alleged broader schemes.  In *Menasco*, the Court recognized that the plaintiffs could successfully allege a pattern if they pled that the defendants engaged in similar schemes to defraud over twenty other investors.  *Menasco*, 866 F.2d at 685. And, in *Friedler*, Judge Blake noted that, "[i]f plaintiffs had alleged a more widespread scheme, involving various predicate acts and other offenders and victims, then the fraud they suffered would more closely resemble the kind that 'rises above the routine' and 'poses a threat to social well-being.'" *Friedler*, 2005 WL 465089, at *12 (quoting *Superior Bank, F.S.B. v. Tandem Nat'l Mortg. Inc.*, 197 F. Supp. 2d 298, 324 (D. Md. 2000)).

Here, plaintiffs have alleged a widespread fraud scheme involving various predicate acts and upwards of twenty victims.  At this stage, the allegations are sufficient to support a claim of a pattern of racketeering activity that "rises above the routine." *Chambers*, 43 F. Supp. 3d at 602 (finding continuity requirement satisfied where members of the enterprise carried out predicate acts in 15 transactions over 18 months); *Superior Bank*, 197 F. Supp. 2d at 324 (finding the

RICO pattern requirement satisfied where over thirty defendants coordinated a mortgage flipping scheme involving twenty-three transactions).

Accordingly, I conclude that plaintiffs have alleged a pattern of racketeering under RICO.

### 3.   Proximate Cause

Defendant also asserts that plaintiffs fail to allege that their injuries "were proximately caused by any underlying mail and wire fraud," because they did not allege that they detrimentally relied on any fraudulent mail or wires sent by American. ECF 14-1 at 28-29. Essentially, Congressional argues that because plaintiffs did not personally receive the alleged fraudulent solicitations, they cannot show "a causal relationship between the direct mail solicitations and Plaintiffs' purchase of title services at an inflated price." ECF 18 at 19.

Plaintiffs contend that their RICO injuries were directly caused by American's fraudulent borrower solicitations because "the solicitations were an integral component of the scheme to defraud." ECF 17 at 22. And, they argue that it is irrelevant whether they received a borrower solicitation because "American Bank treated them as if they had, folding Plaintiffs into the scheme to defraud and imposing on Plaintiffs the fraudulent charges that were the purpose, object and result of the scheme to defraud." *Id.*

To state a claim under RICO, a plaintiff must show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* A link that is "too remote," "purely contingent," or "indirect[t]" is insufficient. *Id.* at 271; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluated a RICO claim for

proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

In *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639 (2008), the Supreme Court addressed whether a plaintiff injured in an alleged mail fraud scheme could satisfy RICO's proximate causation requirement without having relied on the defendant's fraudulent misrepresentation.  It noted, *id.* at 648-49:

> Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation. *See Neder v. United States*, 527 U.S. 1, 24–25 (1999) ("The common-law requiremen[t] of 'justifiable reliance' ... plainly ha[s] no place in the [mail, wire, or bank] fraud statutes"). And one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation.

The Court explained that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."  *Id.* at 649-50; *see also Biggs v. Eaglewood Morg., LLC*, 353 F. App'x 864, 866 (4th Cir. 2009) ("*Bridge*'s holding eliminates the requirement that a plaintiff prove reliance in order to prove a violation of RICO predicated on mail fraud.").  Moreover, "a RICO claim predicated on mail fraud is based on the fraudulent scheme rather than on a particular fraudulent mailing." *Robinson v. Fountainhead Title Grp. Corp.*, WMN-03-3106, 2009 WL 539882, at *2 (D. Md. Mar. 3, 2009).  Therefore, "[p]laintiff need only show reliance on the scheme, not necessarily on any particular fraudulent mailing or misrepresentation."  *Robinson*, 2009 WL 539882, at *95.

Here, the Court has already found that plaintiffs relied on American's alleged fraudulent scheme. Further, the injury as alleged by plaintiffs—overcharging for title and settlement services—was caused by the fraudulent scheme, which was facilitated by borrower solicitations sent by mail and wire transfers. And, plaintiffs need not have personally relied on any specific

fraudulent mailing or wire in order to assert a civil RICO claim. *Chambers*, 43 Supp. 3d at 604 (finding plaintiff did not have to show reliance on a specific fraudulent mailing or wire to assert RICO claim in a putative class action because plaintiff only has to show reliance on the scheme, not any particular misrepresentation).

Accordingly, drawing all inferences in favor of plaintiffs, they have met the proximate cause element at this stage.  Plaintiffs have adequately alleged a RICO claim.

## IV. Conclusion

For the foregoing reasons, I shall deny the Motion.

An Order follows.

Date:   November 6, 2020

/s/
Ellen Lipton Hollander
United States District Judge

48